UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:22-cv-00373-JAW |
| | ) | |
| ROBERT K. NEWMAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR APPOINTMENT OF PREJUDGMENT
RECEIVER TO SELL PROPERTY**

The United States brings a civil suit against an individual defendant and
several entities holding liens on the defendant's property, seeking to enforce federal
tax liens attached to the property.  Before the Court is the Government's motion to
appoint a prejudgment receiver to sell the property.  As the Government has satisfied
its burden for the appointment of a receiver, and the defendant has failed to rebut
the legal basis for such an appointment, the Court grants the motion and appoints a
receiver to take control of and sell the property.

**I.     BACKGROUND**

On November 28, 2022, the United States of America (Government) filed a civil
action pursuant to 26 U.S.C. § 7401, et seq., against: Robert K. Newman; Kennebunk
Savings Bank; the Woods Association, Inc.; Superior Plus Energy Services Inc. d/b/a
Downeast Energy; Casco Bay Electric, LLC; Maine Revenue Services; the Maine
Department of Labor; and the Tax Collector of Kennebunk, Maine. *Compl.* (ECF No.
1).  The Government sought to "(1) reduce to judgment unpaid federal tax liabilities

owed by Robert K. Newman and (2) enforce the federal tax liens against certain real property belonging to him." *Id.* at 1. Specifically, the Government requested:

> (1) a judgment against Mr. Newman for "income tax liabilities for . . . each of the years 2010 through 2017 and 2020";

> (2) a judgment against Mr. Newman for "trust fund liabilities under 26 U.S.C. § 6672 in regard to Newman Communications, Inc., for the periods ending December 31, 2011, March 31, 2012, June 30, 2012, December 31, 2012, and March 31, 2013,";

> (3) a "determination that the United States has valid and subsisting federal tax liens under 26 U.S.C. §§ 6321 and 6322"; and

> (4) an "order enforcing the federal tax liens . . . pursuant to 26 U.S.C. § 7403" against Mr. Newman's Real Property at 13 Annies Way, Kennebunk, Maine (13 Annies Way).

*Id.* at 7-8.

On May 25, 2023, Defendant Kennebunk Savings Bank filed a crossclaim against Mr. Newman, seeking to foreclose on the first of its two mortgages secured by an interest in 13 Annies Way. *Def./Cross-Claim Pl. Kennebunk Savings Bank's Cross-Claim for Foreclosure and Sale Against Def./Cross-Claim Def. Robert K. Newman* (ECF No. 41) (*Def. Kennebunk Savings Bank's Cross-Claim*).

On August 1, 2023, the Government filed a motion to appoint a prejudgment receiver to sell 13 Annies Way and attached a memorandum of law in support of its motion. *Pl. United States of America's Mot. for Appointment of Pre-Judgment*

*Receiver to Sell Prop.* (ECF No. 52) (*Gov't's Mot.*); *id.*, Attach. 1, *Mem. of Law in Support of United States' Mot. for Pre-Judgment Appointment of Receiver to Sell Prop.* (ECF No. 52-1) (*Gov't's Mem. of Law*).  On August 16, 2023, the Court scheduled a hearing for September 22, 2023 on the Government's motion.  *Notice of Hearing on Mot.* (ECF No. 61).   On September 5, 2023, Mr. Newman filed a response in opposition.  *Def. Robert K. Newman's Resp. to Mot. for Appointment of Pre-Judgement Receiver to Sell Prop.* (ECF No. 71) (*Def.'s First Opp'n*).

In advance of the September 22, 2023 hearing, on September 18, 2023, Mr. Newman filed a trial brief and second response in opposition to the Government's motion, *Def. Robert K. Newman's Mot. to Dismiss Mot. for Appointment of Pre-Judgement Receiver to Sell Prop.*[1] (ECF No. 74) (*Def.'s Second Opp'n*), and a statement of facts, *Statement of Facts for Sept. 22, 2023 Receiver Hearing* (ECF No. 75).  The same day, the Government filed its trial brief, which included a reply to Mr. Newman's first opposition.  *Pl. United States of America's Trial Br. for Sept. 22 Hearing on United States' Mot. for Pre-Judgment Receiver (Including Reply to Newman's Resp. Br., Dkt. #71)* (ECF No. 78) (*Gov't's First Reply*).

On September 20, 2023, the Government filed a reply to Mr. Newman's second opposition.  *Pl. United States' Opp'n to Def. Robert K. Newman's Mot. to Dismiss the United States' Mot. for a Pre-Judgment Receiver (Dkt. #74)* (ECF No. 81) (*Gov't's Second Reply*).  On September 21, 2023, Mr. Newman filed a sur-reply.  *Pl. United*

---

[1]      Although Mr. Newman initially called this filing a motion to dismiss, he agreed at the September 22, 2023 hearing to recharacterize it as a response in opposition and trial brief.  *Tr. of Proc.* at 5:4-7:5 (ECF No. 88) (*Hearing Tr.*).

*States' Opp'n to Def. Robert K. Newman's Mot. to Dismiss the United States' Mot. for a Pre-Judgment Receiver (Dkt. #74)[2]* (ECF No. 83) (*Def.'s Sur-Reply*).

On September 22, 2023, the Court held a hearing by videoconference on the United States' motion to appoint a prejudgment receiver. *Mot. Hearing* (ECF No. 85). On September 29, 2023, Mr. Newman filed an amended version of his closing arguments in light of instructions given by the Court during the September 22, 2023 hearing. *Def. Robert K. Newman's Amendment to Closing Args. at Sept. 22, 2023 Pl.'s Mot. for Receiver* (ECF No. 89) (*Def.'s Am. Closing Args.*).

## II.   THE PARTIES' POSITIONS

### A.   The Government's Motion to Appoint a Prejudgment Receiver

The Government asks the Court to appoint a prejudgment receiver to "take possession of and market for sale" 13 Annies Way because the property "and the federal tax liens attached to it are losing value due to accumulating mortgage interest, property tax liabilities, and general neglect including significant water damage." *Gov't's Mot.* at 1. According to the Government, the current value of 13 Annies Way "is insufficient to pay senior liens and then satisfy indisputable federal tax liens," and appointing a receiver to sell the property would "halt the accumulating irreparable harm to the United States." *Id.* at 1-2.

In its memorandum of law, the Government asserts that appointing a prejudgment receiver is proper because the Government "has a high likelihood of

---

[2]      Mr. Newman's sur-reply has the same title as the Government's reply. This appears to be an oversight by Mr. Newman, and to avoid confusion, the Court refers to the filings by their shortened titles throughout this Order.

success on its claims . . . and is irreparably harmed by every day that passes." *Gov't's Mem. of Law* at 1. The Government makes four arguments in support of its claim that it has a high likelihood of success. First, with respect to Mr. Newman's unpaid income taxes, the Government claims that "[w]ith two exceptions, the assessments of tax . . . were self-reported by Newman and he cannot now dispute them." *Id.* at 7-8. Second, the Government argues it is likely to recover Newman Communications, Inc.'s unpaid employment taxes because "Newman has admitted that he was a 'responsible person' required to collect, truthfully account for, or pay over the employment taxes," and he "has little room to claim he was not willful." *Id.* at 9-10. Third, the Government represents that "notice and demand of the income tax liabilities and [unpaid employment taxes] was given," and as a result, "tax liens automatically arose as of the dates of assessment . . . and attached to all Robert Newman's property." *Id.* at 11. Fourth, the Government contends that none of Mr. Newman's defenses has "any basis in law." *Id.* at 13.

The Government goes on to argue that appointing a receiver is necessary to prevent irreparable harm. The Government represents that Mr. Newman "has defaulted on the primary mortgage" on 13 Annies Way, and unpaid interest is accumulating "at a per diem rate of $75.61 and over $2,200 monthly." *Id.* at 18. The Government also states that the initial receiver nominee "found serious neglect to the property . . . particularly water damage and a malfunctioning boiler." *Id.* at 18-19.

The Government concludes by contending that "other equitable factors weigh in favor of immediate receivership." *Id.* at 19. These factors include the inadequacy

of alternative legal remedies, the possibility that Mr. Newman has other living arrangements, and Kennebunk Savings Bank's impending foreclosure action. *Id.* at 19-20.

### B.   Robert Newman's Oppositions to the Appointment of a Receiver

Mr. Newman filed two oppositions to the Government's motion. Mr. Newman begins his initial opposition by accusing the Government of violating the Taxpayer Bill of Rights and conducting a "collection and prosecution process that has lacked organization and fact and had only one goal—removing the defendant from his property." *Def.'s First Opp'n* at 3. He contends that appointing a receiver would result in the Government obtaining "no more than 10-15 percent of the amount of money the defendant allegedly owes, leaving him with 85-90 percent of the debt and no home." *Id.* He also expresses concern that a sale of 13 Annies Way by a receiver would not yield just compensation and therefore violate the Fifth Amendment's Takings Clause. *Id.* at 5.

Mr. Newman then responds to the Government's arguments. Addressing the Government's likelihood of success, Mr. Newman "challenges any 2010 tax debt." *Id.* at 9. He also represents that the failure of Newman Communications, Inc. to pay certain employment taxes "was not willful and instead due to negligence, inadvertence, or mistake or conduct that was the result of good faith misunderstanding of the requirement of the law." *Id.* at 12.

Mr. Newman further argues that any irreparable harm the Government might suffer would result from its decision to market 13 Annies Way for too low of a selling

price. *Id.* at 13-14.  He contends that "[t]he small amount of value that is being lost can be made up multiple fold by marketing the property at $1.7 million, minus $300,000 for repairs or $1.4 million." *Id.* at 14.  He goes on to take issue with the Government's position that 13 Annies Way is being neglected, representing that "the Property is being cared for aggressively." *Id.* at 21.

Mr. Newman lastly disputes whether equitable factors support the appointment of a receiver.  He represents that 13 Annies Way is his primary residence, and that he has offered to enter into a payment plan whereby he would pay the Government between $7,500 and $10,000 every month. *Id.* at 2, 4.  He further contends that he has previously cured a mortgage default and "has the right to do that again within the proper timeframe." *Id.* at 7.  Finally, Mr. Newman questions whether a receiver would be able to sell 13 Annies Way before the conclusion of the selling season in Maine. *Id.* at 8.

In his second opposition, Mr. Newman declares that "based on the proposed property sale price in the Receiver motion of $700,000 or as the Plaintiff stated, $600,000, both of these figures would garner the Plaintiff no more than $18,000 and more likely zero." *Def.'s Second Opp'n* at 2.  Mr. Newman bases this claim on his contention that the Government underestimated the number and monetary amount of senior liens on 13 Annies Way. *Id.* at 3-4.  He also suggests that 13 Annies Way could not sell for much more than $700,000 because any sale "would need to be a cash sale as the buyer would not be able to get a mortgage." *Id.* at 4.

Attached to Mr. Newman's second opposition is a declaration regarding the condition of 13 Annies Way. *Id.*, Attach 1., *Decl. of Robert K. Newman Regarding Condition of 13 Annie's Way. Kennebunk, Me.* (ECF No. 74-1). In the declaration, Mr. Newman asserts that 13 Annies Way "has been well-maintained including a professional cleaner every other week and regular carpet cleaning." *Id.* at 1. Mr. Newman goes on to identify eighteen issues with the property, which he contends will cost roughly $300,000 to repair. *Id.* at 2-5. Mr. Newman claims that an IRS appraisal of the property failed to account for many of these repairs and emphasizes that "[i]t would be critical to subtract an estimated $300,000" from the IRS estimate. *Id.* at 5.

### C.   The Government's Replies

In response to Mr. Newman's first opposition, the Government claims that "Newman owes approximately $500,000 in liabilities for taxes he reported owing on returns he signed for himself and his business." *Gov't's First Reply* at 3. The Government then reiterates that Mr. Newman "has no substantive defense" to his self-reported income tax liabilities. *Id.* Regarding Mr. Newman's contention that his failure to pay employment taxes on behalf of his business was not willful, the Government rejoins that he "should have been aware of all unpaid employment taxes, and he was surely aware of those unpaid amounts he himself reported." *Id.*

The Government also addresses Mr. Newman's arguments concerning the value of 13 Annies Way and the senior liens on the property. Specifically, the Government represents that "an IRS Property Appraisal and Liquidation Specialist, Roger Sweeney, has estimated that the fair market value of the property is between

$1,000,000 and $1,250,000." *Id.* The Government then reviews the value of the senior liens on the property and concludes that "a substantial-but-not-total satisfaction for the federal tax liens is virtually guaranteed" if 13 Annies Way sells for the fair market value estimated by the IRS. *Id.* at 3-5. The Government later caveats this statement, cautioning that "[a]ll federal tax liens and the other encumbrances . . . will not be fully paid unless the sale price is around or over $1.6 million, which is very unlikely." *Id.* at 5. According to the Government, this fact, in conjunction with the increasing senior liens, heightens the urgency of appointing a receiver. *Id.*

The Government then rejects Mr. Newman's suggestion that the sides enter into a payment plan, writing that "Newman's assertions he is willing or able to fully pay the liabilities through a payment plan of $7,500 to $10,000 monthly are not supported by his provable financial condition and are belied by his long history of delinquencies." *Id.* The Government further contends that Mr. Newman's financial history indicates an inability to redeem his Kennebunk Savings Bank mortgages, which are currently in default. *Id.* at 7.

The Government concludes by addressing some of the legal contentions in Mr. Newman's opposition. Regarding Mr. Newman's contention that selling 13 Annies Way for too low a price violates the Takings Clause, the Government argues that "it is premature for Newman to allege a lack of 'just compensation,' or to suggest the parties could possibly agree on a sale price ahead of time." *Id.* at 9. It also contends that "fair market value will be ensured by appointing a real estate agent as Receiver

9

to market the property through public listing and showing the property to prospective buyers who can submit competing offers." *Id.* at 9.

In its reply to Mr. Newman's second opposition, the Government claims that "Newman is changing his tune, from a tactic to delay a sale with unrealistically optimistic estimates and impractical sale proposals, to an attempt to halt a sale completely with a contradictory, pessimistic estimate of value." *Gov't's Second Reply* at 2.  The Government also contends that "if the Property's value is really just a little north of $700,000 as Newman now suggests, the United States is still on the cusp of having an economic interest, which actually increases the urgency of completing a receivership sale." *Id.* at 3.  It concludes by noting that "the most equitable path forward for all lienholders is an expeditious sale of the Property at a fair market price, which will be achieved by immediate appointment of a Receiver." *Id.* at 5.

### D.   Robert Newman's Sur-Reply and Amended Closing Argument

In his sur-reply to the Government's Second Reply, Mr. Newman clarifies that he "sees the value of the Property between" $1,700,000 and $1,800,000 and "will not be satisfied with a figure between $1 million and $1.25." *Def.'s Sur-Reply* at 1.  Mr. Newman also takes issue with the estimate provided by Roger Sweeney, suggesting that Mr. Sweeney is biased because he works for the IRS and "missed a significant amount of damage/upgrades in his inspection." *Id.* at 1-2.  Mr. Newman concludes by asserting that the failure of Christina Stone, the Government's proposed receiver, to provide a listing price for 13 Annies Way "is completely unfair and provides no ability to defend against the Plaintiff's statements." *Id.* at 2.

In his amended closing arguments, Mr. Newman encourages the Court to "demand that this Receiver provide a listing price and the Plaintiff provide a statement of potential revenue as a condition of Court approval or reject the Motion and move on to trial." *Def.'s Am. Closing Args.* at 4.  He then represents that he "has placed the Property for sale by owner for $1.8 million" and asks the Court to allow him until February 28, 2024 to sell the property.  *Id.* at 9-10.  Mr. Newman believes he will be able to sell 13 Annies Way for at least $1,600,000, which he claims would be sufficient to satisfy all liens and leave him with money to relocate.  *Id.* at 10. Attached to Mr. Newman's amended closing arguments are several dozen photographs of 13 Annies Way, which illustrate the current condition of the property. *Id.*, Attach. 1, *Photographs of 13 Annies Way* (ECF No. 89-1).

## III.   LEGAL STANDARD

26 U.S.C. § 7402(a) confers upon "district courts . . . such jurisdiction to make and issue in civil actions . . . orders appointing receivers . . . and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws."  *Id.*  The remedies described in 26 U.S.C. § 7402(a) "are in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce such laws."  *Id.*  The authority granted by 26 U.S.C. § 7402(a) "has been construed broadly, to allow courts the full panoply of remedies necessary to effectuate the enforcement of the federal tax laws."  *United States v. Bartle*, No. IP 01-0769-C-B/S, 2001 U.S. Dist. LEXIS 22934, at *15 (S.D. Ind. Jan. 16, 2001).

In cases brought to enforce federal tax liens, "at the instance of the United States, the court may appoint a receiver to enforce the lien, or, upon certification by the Secretary during the pendency of such proceedings that it is in the public interest, may appoint a receiver with all the powers of a receiver in equity."  26 U.S.C. § 7403(d).  The First Circuit has expressly approved the appointment of a receiver under 26 U.S.C. § 7403 to enforce the internal revenue laws.  *Goldfine v. United States*, 300 F.2d 260, 261-62 (1st Cir. 1962).  "When a request is made for an appointment of a receiver under [26 U.S.C. § 7403(d)], the Government needs only to make a prima facie showing that a substantial tax liability probably exists and that the Government's collection efforts may be jeopardized if a receiver is not appointed." *In re McGauchey*, 24 F.3d 904, 907 (7th Cir. 1994) (citing *United States v. O'Connor*, 291 F.2d 520, 525 (2d Cir. 1961); and *Florida v. United States*, 285 F.2d 596, 598 (8th Cir. 1960)).

Together, 26 U.S.C. §§ 7402(a) and 7403(d) provide courts with "broad discretion to appoint a receiver to liquidate property subject to federal tax liens to assist the United States in the collection of taxes."  *United States v. Scherer*, 532 F. Supp. 3d 485, 489 (S.D. Ohio 2021).  As part of this discretion, courts have "the power to authorize a receiver to conduct a sale of rights or property in a manner similar to the way they would be sold in the commercial market."  *Id.*

## IV.   DISCUSSION

Since Mr. Newman does not dispute the Court's authority to appoint a prejudgment receiver, or the standard for appointment articulated by the

12

Government, the Court turns to whether the Government has satisfied its burden. The First Circuit has not articulated a test for appointing a prejudgment receiver pursuant to 26 U.S.C. §§ 7402(a) and 7403(d). Other circuits have held that the Government must make a prima facie showing that (1) "a substantial tax liability probably exists" and (2) "the Government's collection efforts may be jeopardized if a receiver is not appointed." *In re McGaughey*, 24 F.3d at 907 (citing *O'Connor*, 291 F.2d at 525; and *Florida*, 285 F.2d at 598). Since all the circuits that have adopted a test appear to adhere to the same test, the Court adopts that test for purposes of adjudicating the present motion. Ruling on the record before it, the Court concludes that the Government has made both required showings.

Regarding the existence of a substantial tax liability, the Government contends that Mr. Newman owes hundreds of thousands of dollars in past due taxes based on income taxes reported on his signed tax returns, IRS assessments of his tax returns, and unpaid employment taxes on behalf of his business. *See Gov't's Mem. of Law* at 8-11. In support of this allegation, the Government supplied documentation showing that Mr. Newman appears to have a tax liability totaling over $325,000 based solely on self-reported income taxes for the years 2011 through 2017 and 2020. *See Gov't's Mot.*, Attach. 4, *Decl. of Mary Bishop, Revenue Officer Advisor* ¶ 13, Exs. 10-17. The Government further contends that Mr. Newman's tax liability totals $421,009.50 when assessments for 2010 and 2011 are included. *Id.* ¶ 11. Mr. Newman only disputes whether he is liable for the 2010 assessment, which totals $42,675.22. *Id.*; *see Def.'s First Opp'n* at 9. In other words, Mr. Newman does not dispute that his

liability for unpaid income taxes totals at least $378,334.28, and he even offers to enter into a payment plan to satisfy this debt. *See Def.'s First Opp'n* at 3-4. Although the Court could not locate a legal definition of "substantial"[3] in this context, a potential tax liability of more than $325,000 would seem to meet any common definition of "substantial,"[4] and Mr. Newman does not claim that this amount is not "substantial." Therefore, the Court finds that the Government has shown that a "substantial tax liability probably exists."[5] *In re McGaughey*, 24 F.3d at 907.

The Court turns to the second prong of the analysis, whether the Government's collection efforts may be jeopardized if a receiver is not appointed. The parties agree that there are several senior liens on 13 Annies Way, including two mortgages held by Kennebunk Savings Bank, and that Mr. Newman has stopped making payments on these mortgages, as well as the property taxes for 13 Annies Way. As a result,

---

[3]     Bryan A. Garner offers the following helpful contrast between nominal and substantial damages:

> **[N]ominal damages; substantial damages.** *Nominal damages* are "awarded in a trivial amount merely as a recognition of some breach of a duty owed by a defendant to a plaintiff and not as a measure of recompense for loss or detriment sustained." *Substantial damages* are "the result of an effort at measured compensation." Charles T. McCormick, *Handbook on the Law of Damages* 85 (1935). *Nominal damages* are symbolic; *substantial damages* are compensatory.

BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 607 (3d ed. 2011).

[4]     Although the origins of the "substantial tax liability" requirement are not obvious, the Court suspects that the requirement derived from the "public interest" requirement of 26 U.S.C. § 7403(d). Presumably, the resort to a receiver would not be in the public interest unless the amount at stake were substantial.

[5]     The Government contends that Mr. Newman has additional tax liabilities based on "certain employment taxes of Newman Communications, Inc. for five tax periods from 2011 to 2013, totaling over $360,000." *Gov't's Mem. of Law* at 9. Mr. Newman disputes whether he is liable for this additional amount and claims that he was not "willful" with respect to his business's failure to pay the employment taxes. *Def.'s First Opp'n* at 12. Since the Court does not need to resolve this issue to determine whether a substantial tax liability probably exists, it declines to do so.

Kennebunk Savings Bank filed a crossclaim against Mr. Newman, seeking to foreclose on the first mortgage.  *See Def. Kennebunk Savings Bank's Crossclaim.*

Kennebunk Savings Bank is proceeding under the state foreclosure statute, 14 M.R.S. § 6321, et seq.  *Id.* at 2.  The Maine foreclosure statute contains several provisions that delay resolution of a foreclosure.  Of note, 13 Annies Way is a residential property, and if it is owner-occupied, the foreclosure mediation program under 14 M.R.S. § 6321-A likely applies.  Under this program, before Kennebunk Savings Bank may proceed with the statutory foreclosure, Kennebunk Savings and Mr. Newman must engage in the state-sanctioned mediation process.  *See U.S. Bank Trust v. Morin*, No. 2:21-cv-00175-JAW, 2021 U.S. Dist. LEXIS 213600, at *3-5 (D. Me. Nov. 4, 2021); *Private Capital Fund LLC v. Begg*, No. 2:21-cv-00090-JDL, 2021 U.S. Dist. LEXIS 146961, at *2-4 (D. Me. Aug. 5, 2021); *HSBC Bank USA, Nat'l Ass'n v. Lombardo*, No. 2:19-cv-00291-NT, 2020 U.S. Dist. LEXIS 194419, at *1-5 (D. Me. Oct. 19, 2020).  Even after any mandatory state mediation process has been completed, the Maine statutory foreclosure process entails some additional delay, including a hearing and judgment, 14 M.R.S. § 6322, the expiration of a redemption period of at least ninety days, *id.*, and the provision of notice before a public sale, 14 M.R.S. § 6323.

Mr. Newman suggests he is able to stave off the foreclosure process, and thus prevent the delays described above, by redeeming the mortgages.  At the hearing on the Government's motion to appoint a receiver, counsel for Kennebunk Savings Bank represented that Mr. Newman would be required to pay $59,439.14 to reinstate both

mortgages on 13 Annies Way.  *Tr. of Proc.* at 17:14-16 (ECF No. 88) (*Hearing Tr.*).
Mr. Newman claims he can pay, *see id.* at 87:3-6,  but he has failed to provide any
evidence of his ability to do so, representing only that he will "probably" obtain the
money from family member.  *Id.* at 87:6-7.  Mr. Newman has also failed to provide
any explanation for why, if he has been able to pay all along, he has not already done
so.  Based on this record, the Court cannot find that Mr. Newman is able to redeem
the mortgages on 13 Annies Way without more convincing, specific evidence of his
ability to do so.  As it stands, Kennebunk Savings Bank could reasonably foreclose on
the property.

Apart from the delay inherent in Maine's statutory foreclosure process, the
Court finds that placement of 13 Annies Way for sale with an experienced real estate
broker is substantially more likely to generate a higher sales price than proceeding
to public sale through the foreclosure process.  Although Mr. Newman voiced his
confidence in his ability to sell 13 Annies Way for a reasonable price, he has not done
so to date, and the Court is skeptical that he could match the marketing and sales
skills of a respected local real estate broker such as Ms. Stone.  Indeed, the Court
finds that it is far more likely that 13 Annies Way will garner a higher sales price if
Ms. Stone actively markets it on the open market, than if Kennebunk Savings Bank
forecloses the residence and sells it at a duly noticed public sale.  Given that a higher
sales price would leave more funds to satisfy the Government's liens, the Court
concludes that the pending of foreclosure crossclaim by Kennebunk Savings Bank

16

constitutes sufficient evidence that the Government's collection efforts could be jeopardized absent the appointment of a receiver.[6]

Having found that the Government has satisfied its burden of justifying the appointment of a prejudgment receiver, the Court now assesses the qualifications of Christina Stone, the Government's proposed receiver. Ms. Stone represents that she has "over twenty years of experience serving as a realtor for real estate transactions in York County" and has been "the listing agent for many homes in the area ranging in value from a few hundred thousand to over $2 million." *Pl.'s Substitution of Receiver Nominee*, Attach. 2, *Decl. of Christina Stone* ¶ 5 (ECF No. 72-2). At the September 22, 2023 hearing, Ms. Stone reiterated that she has been a real estate agent since 2002. *Hearing Tr.* at 27:17-18. Based on Ms. Stone's experience as a real estate agent in the Kennebunk area, the Court finds that she is qualified to serve as the receiver in this case.

Mr. Newman contends that the Court should not appoint Ms. Stone as the receiver because she "clearly does not understand the Receiver process" as set forth in the Government's proposed order of appointment.[7] *Def.'s Am Closing Args.* at 2. Mr. Newman bases this contention on Ms. Stone's testimony at the September 22,

---

[6]    The Government also contends that its collection efforts are jeopardized by the declining value of 13 Annies Way due to "serious neglect to the property." *Gov't's Mem. of Law* at 18-19. Mr. Newman repeatedly disputed this characterization and represents that the "inside of the home is clean and the outside property is well kept up. While there are major repairs to be made, the value as a result of them is not decreasing on an ongoing basis." *Def.'s Second Opp'n* at 4-5. As deterioration of the property is not a prerequisite for the appointment of a receiver, the Court declines to address this issue.

[7]    The Court adopts the Government's proposed order of appointment, with a few minor modifications, below. The Court has not changed the provisions concerning the listing price of 13 Annies Way.

2023 hearing that the Government would decide the listing price for 13 Annies Way. *Id.* The Court has reviewed Ms. Stone's testimony and finds that she does understand the receiver process. Ms. Stone testified that, as the receiver, she would be "securing the building and preparing it for market and then marketing it," and her goal would be "to obtain the highest and best return and bring it to closing." *Hearing Tr.* at 28:10-18. Regarding the exchange referenced by Mr. Newman, the Court does not interpret Ms. Stone's testimony to be inconsistent with the proposed order of appointment, which allows the receiver to set the listing price "subject to approval" by the Government. *See Notice Regarding Revised Proposed Order of Appointment of Pre-Judgment Receiver*, Attach. 1, *[Proposed] Order of Appointment of Pre-Judgment Receiver* at 5 (ECF No. 84-1). Given the Court's satisfaction with Ms. Stone's qualifications and understanding of the receivership process, the Court accepts the recommendation of the Government and appoints Ms. Stone to serve as the receiver for 13 Annies Way.

The Court concludes by addressing Mr. Newman's concerns about the appointment of a receiver. The Court believes that many of Mr. Newman's objections to a receiver stem from his fear that a receiver will sell 13 Annies Way for too low of a price, "leaving him with 85-90 percent of the debt and no home." *Def.'s First Opp'n* at 3. The mere appointment of a receiver, however, does not set the sale price of 13 Annies Way. Since no listing or sale price has been set, the Court declines to address Mr. Newman's arguments concerning the pricing of 13 Annies Way at this time.

Furthermore, under the terms of the order appointing Ms. Stone as receiver, which can be found below, any listing price for 13 Annies Way must be approved by the Court. Mr. Newman has the right to object to any price proposed by the Government before the Court approves a listing price. Any purchase agreement for 13 Annies Way also must be approved by the Court, and Mr. Newman can similarly object to any purchase agreement. Should Mr. Newman wish to reiterate any of his concerns about the pricing of 13 Annies Way at a later date, he remains free to do so.

## V. CONCLUSION

The Court takes the following actions:

1) The Court <u>GRANTS</u> Plaintiff United States of America's Motion for Appointment of Pre-Judgment Receiver to Sell Property (ECF No. 52);

2) The Court <u>ORDERS</u> that 13 Annies Way be sold to enforce the federal tax liens which attached to Defendant Robert K. Newman's interest in the Real Property and secure the federal tax liabilities of Mr. Newman;

3) The Court further <u>ORDERS</u> that Christina Stone, Senior Vice President and Broker at Legacy Properties Sotheby's International Realty in Kennebunk, Maine, is appointed as Receiver for the purposes of assisting in the enforcement of the federal tax liens under 26 U.S.C. §§ 7402(a) and 7403(d), and she is authorized and directed to take control, and arrange the sale, of 13 Annies Way in accordance with this Order; and

4) The Court further <u>ORDERS</u> that the sale of the Real Property will be subject to the following numbered paragraphs of terms and conditions:

19

1.      **Sale of Clear Title**: The sale of the Real Property shall be free and clear of all rights, titles, claims, liens, and interests of all parties to this action, including any rights of redemption.  Subject to the judgment and other orders of this Court, including the provisions of this Order, any rights, titles, claims, liens, and interests of all parties to this action shall attach to the proceeds of sale to the same extent and in the same order of priority as they did against the Real Property.

2.      **Sale Subject to Building Lines, Laws, Ordinances, Regulations and Items of Record**: The sale shall be subject to building lines, if established, and all laws, ordinances, and governmental regulations (including building and zoning ordinances) affecting the Real Property, and easements, restrictions, and reservations of record, if any.

3.      **"As Is" Sale**: The Real Property shall be offered for sale "as is," with all faults and without any warranties either express or implied.

4.      **Sale Subject to Approval by the Court**: Although the Receiver may execute and enter into a purchase agreement for the sale of the Real Property as the seller, as provided more fully below, the executed agreement must be submitted by motion to the Court for its approval, and a closing for the sale may not take place unless and until the Court enters an order approving the sale.

5.   **Compensation for the Receiver**: If the buyer has a broker entitled to a commission from the gross proceeds of the sale, the Receiver shall be compensated from the proceeds of the sale in an amount not to exceed six percent (6%) of the gross sale proceeds paid by the buyer at closing.  The Receiver must pay any buyer broker's commission for the sale from her commission.  If there is no separate buyer broker or if the broker is affiliated with the Receiver's brokerage, Legacy Properties Sotheby's International Realty, then the total commission shall be five percent (5%) of the gross sale proceeds paid by the buyer.  At closing, the Receiver and any buyer broker shall receive payment of the above-described compensation from a distribution from the gross proceeds of a sale previously approved by the Court, as a direct cost of sale, and before any net sale proceeds are used to pay the claims of the parties to this action.

6.   **Rights, Powers and Authority of the Receiver**: The Receiver shall have all of the rights and powers necessary to fulfill her obligations under this Order, specifically including, but not necessarily limited to, the power to enter the premises, to inspect the premises, to secure and preserve the property and its salability, to list and advertise the sale of the property, and to show it to prospective buyers.

   a.   Expenditures by the Receiver: The Receiver may, but is not required to, make from her funds or her brokerage's funds

payment of real property taxes, insurance, water, sewer, and other utility charges of fees and/or the cost of having a contractor cut the lawn, shovel snow, or otherwise maintain or improve the property.

b. <u>Listing Price</u>: The Receiver shall determine the initial listing price for the Real Property subject to approval by the United States.  Before the property is listed for sale, the United States shall provide notice of the proposed initial listing price to all defendants, who shall have five days to file a motion to seek review of the proposed initial listing price by the Court.  If lack of buyer interest or buyer feedback indicates that the initial listing price for the property is too high, the Receiver, subject to approval by the United States, may select a lower listing price.  Before the listing price for the Property is changed, the United States shall provide notice of the proposed revised listing price to the defendants, who shall have five days to file a motion to seek review of the proposed revised listing price by the Court.

c. <u>Earnest Money Deposit</u>: An earnest money deposit payable by cash, certified check, or cashier's check shall be required as part of a purchase agreement, in a commercially reasonable amount that shall be subject to approval by the United States.  The earnest money deposit from a buyer shall be held by the

Receiver's brokerage, a title insurance company, or their agent. The Receiver shall provide the deposit at or shortly before the closing for the sale to the title company or attorney serving as the escrow and distribution agent and conducting the closing of the sale. If the purchaser fails to perform under the terms of the agreement, the purchase agreement shall be deemed null and void and the deposit shall be forfeited. Any forfeited earnest money deposit shall be used first to pay the cost, if any, of document preparation for the transaction that did not close, and any amount remaining shall be applied to the federal tax liens. If a purchaser fails to perform under the terms of a purchase agreement, the Receiver shall relist the property under the terms and conditions of the order. Any dispute regarding the return or forfeiture of the earnest money deposit shall be resolved by appropriate motion for interpleader in this case with all claimants having a right to participate without being added to the caption as parties.

d. Purchase Agreement Generally: The purchase agreement shall require that the balance of the purchase price is to be paid at closing by cash, certified check, wire transfer or cashier's check. A purchase agreement may include other customary and

23

reasonable terms in the discretion of the United States, in consultation with the Receiver.

e. <u>Negotiation of a Purchase Agreement and Its Submission to the Court for Approval</u>: The Receiver shall negotiate a sale of the property, and in so doing may make a counteroffer subject to approval by the United States, and may agree to a purchase price and enter into a purchase agreement subject to approval by the United States and subject thereafter to approval by the Court. When the Receiver obtains a purchase agreement for the property that the United States has approved, the United States shall file a motion with the Court for approval of the sale on the terms of the agreement. The defendants shall have the right to file an objection to the motion.

f. <u>Closing for Sale</u>: If the Court enters an order approving a sale on the terms of the purchase agreement, the Receiver shall arrange a closing with the buyer and a title company or an attorney if applicable law requires an attorney to conduct real property sale closings that the Receiver has selected to conduct the closing and serve as escrow and distribution agent for the sale (the United States must approve of the fee to be charged by any such closing attorney). After the Court approves a purchase agreement, the Receiver shall provide the title company or the attorney

conducting the closing with a Receiver's Deed to the Real Property, which may be used to convey title to the buyer(s) at the closing for the sale.  Except for retaining a closing attorney, the Receiver is not expected to need separate counsel and is not authorized to retain separate counsel without the approval of this Court.

7.      **<u>Priority of Reimbursement of the Receiver for Expenses She or Her Firm Pay for Maintenance, Repair, Renovation, and to Otherwise Protect and Preserve the Property and Its Salability</u>**: To the extent that the Receiver, with the prior written approval of the United States, expends any funds of her own or of her firm to preserve and maintain the property or improve its salability (such as the cost of having a contractor cut the lawn, shovel snow off the adjoining sidewalk, repair a broken window, repair appliances, or paint a room), the Receiver shall be entitled to recover the same at closing from the gross proceeds of the sale with priority over the claims of all parties, except any claims for real property taxes and water and sewer fees.  The Receiver must provide counsel for the United States with receipts, paid invoices, or copies of cancelled checks proving the amounts that she paid for such expenses.

8.      **<u>Disbursements at Closing & Deposit of Net Proceeds:</u>** At the closing, the title company or attorney conducting the closing shall

disburse from the gross sale proceeds the funds necessary to pay any outstanding real property taxes, water, sewer, and other utility fees, the seller's share of fees and costs reasonable and necessary for the closing, commissions for the Receiver and any to be shared with a buyer realtor, agent or broker, and reimbursement of expenses paid by the Receiver or her firm.  The senior mortgages of Kennebunk Savings Bank may be paid off out of the remaining proceeds, with the agreement of the United States and to the extent it can provide documentation or other evidence showing amounts owing for principal, interest, and advances for insurance and real property taxes, and the proceeds remaining after any paying to Kennebunk Savings Bank shall be remitted to the Clerk of this Court for deposit into the Court registry, in accordance with applicable laws and rules.  If the amount claimed by Kennebunk Savings Bank has not been agreed, it shall be entitled to priority in distribution from the proceeds deposited with the Court, with this Court to resolve any dispute regarding the amount.

9.    **Motion for Distribution of Net Proceeds of Sale**: After the closing and the resolution of all claims, the United States shall file a motion for distribution of the net proceeds of sale deposited in the Court registry pursuant to the previous paragraph.  The motion shall specify the persons or entities that are to receive the remaining proceeds of sale and the respective amount each of them is to receive.

10.   **No Interference with Sale or Value**: The defendants, and any other persons acting in concert with them or on their behalf, are prohibited from interfering with the Real Property, the Receiver, and the Receiver's efforts to comply with her duties and obligations under this Order.  The defendants shall neither do anything that tends to reduce the value or marketability of the property nor cause or permit anyone else to do so.  They shall not record any instruments, publish any notice, or take any other action (such as running newspaper advertisements, posting signs, or making internet or social media postings) that may directly or indirectly tend to adversely affect the value of the Real Property or that may tend to deter or discourage potential buyers from making offers to purchase the Real Property, nor shall they cause or permit anyone else to do so.  Violation of this paragraph shall be deemed a contempt of court and punishable as such.

11.   **Liability of Receiver**: The Receiver shall have no personal liability to Mr. Newman, his estate, his heirs, or anyone acting on his behalf, except if the Receiver has acted outside the scope of the receivership authority, or committed fraud or acted with gross negligence.  No suit or other claim or complaint of any kind shall be lodged against the Receiver in any other court or with any other governmental, quasi-governmental, regulatory, or licensing authority

without prior approval of this Court on motion for leave to lodge such a complaint.

12.   **Vacating the Premises:** All persons occupying the Real Property shall vacate it within 30 days of entry of this Order.[8]  When vacating the premises, each person must take with them his or her personal property (but leaving all improvements, buildings, fixtures, and appurtenances to the property, including refrigerators, kitchen ranges, dishwashers, and other large appliances).  If any person fails or refuses to vacate the Real Property as required by this Order, the Receiver is authorized to coordinate with the United States Marshals Service, which may take all actions that are reasonably necessary to have those persons ejected without further order of the Court.  The United States Marshals Service is authorized and directed to take any and all necessary actions, including but not limited to the use of reasonable force, to enter and remain on the premises, which includes, but is not limited to, the land, buildings, vehicles, and any other structures located thereon, for the purpose of executing this Order.  The United States Marshals Service is further authorized and directed to arrest and/or evict from the premises any and all persons who obstruct,

---

[8]      Mr. Newman asks for sixty days to vacate.  However, his sixty-day period would guarantee that any potential sale would have to be delayed until the onset of early winter, which – as Mr. Newman has noted – is not the ideal time to sell residential property in Maine.

attempt to obstruct, or interfere or attempt to interfere, in any way, with the execution of this Order.

13.     **Removal of Personal Property from the Real Property:** Any personal property remaining on the Real Property after the time by which the property must be vacated under the preceding paragraphs will be deemed forfeited and abandoned, and the United States, the Receiver, the United States Marshals or their agents are authorized to dispose of the personal property, without further order of this Court, in any manner they see fit, including sale, in which case the proceeds of the sale are to be applied first to the costs and expenses of sale and the balance shall be held in escrow in a manner consistent with private sales pending distribution pursuant to further order of this Court.

14.     **Cooperation Required:** All parties and other persons acting in concert with them or on their behalf shall cooperate with the Receiver in her efforts to fulfill her duties and obligations under this Order.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of October, 2023