UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00373-JAW |
| | ) | |
| ROBERT K. NEWMAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ————————————————————— | | |
| KENNEBUNK SAVINGS BANK, | ) | |
| | ) | |
| Crossclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT K. NEWMAN, | ) | |
| | ) | |
| Crossclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Crossclaim Parties-in-Interest | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT, MOTION FOR
DISBURSEMENT, AND MOTION TO DISMISS CROSSCLAIMS**

In a long-running suit to enforce a federal tax lien, the federal government moves for summary judgment on its remaining claims and for the entry of final judgment and, separately, for disbursement of court-held funds. A claimant additionally moves for the voluntary dismissal of its crossclaim against the defendant. The court grants all pending motions, ordering judgment in favor of the

federal government, the disbursement of court-held funds, and dismissal of the crossclaim.

## I. PROCEDURAL BACKGROUND

On November 28, 2022, the United States of America (the Government) filed a civil action pursuant to 26 U.S.C. § 7401 *et seq.* against Robert K. Newman and several other defendants, seeking to recover Mr. Newman's unpaid federal taxes and enforce federal tax liens against Mr. Newman's real property, including the real property located at 13 Annies Way, Kennebunk, Maine (13 Annies Way or the Property).[1] *Compl.* 1-10 (ECF No. 1). The complaint joined as defendants numerous other entities based on existing liens or potential interests in 13 Annies Way, including Kennebunk Savings Bank (KSB); the Woods Association, Inc.; Superior Plus Energy Services Inc., d/b/a Downeast Energy; Casco Bay Electric, LLC; the Maine Revenue Services; the Maine Department of Labor, Bureau of Unemployment Compensation; and the Tax Collector of Kennebunk, Maine. *Compl.* ¶¶ 3-10.

On May 25, 2023, KSB brought a crossclaim for forfeiture and sale of 13 Annies Way against Mr. Newman, asserting a mortgage interest in the Property and requesting the Court determine the amount due on the outstanding mortgage, determine the order of priority and amounts due to each party, grant possession of the Property to KSB upon expiration of the redemption period, and award other relief

---

[1]  The complaint and the attached warranty deed spell "Annie's Way" with an apostrophe. *Compl.* ¶ 10; *id.*, Attach. 1, *Warranty Deed* at 1-2. However, in the motion for summary judgment on remaining claims, the Government has spelled Annies Way without the apostrophe. *See Pl. United States' Mot. for Summ. J. on Remaining Claims* at 1 (ECF No. 147). The Court does not know which spelling is correct. In this order, the Court uses the spelling without the apostrophe.

as the Court deems just and proper. *Def. / Crosscl. Pl. Kennebunk Sav. Bank's Crosscl. for Foreclosure and Sale Against Def. / Crosscl. Def. Robert K. Newman* (ECF No. 41) (*KSB's Crosscl.*).

Several months later, on August 29, 2023, the Government moved for partial summary judgment on its claims regarding Mr. Newman's self-reported income tax liabilities, asking the Court to enter money judgment for those liabilities and a judgment decreeing the sale of the Property. *Pl. United States of America's Mot. for Partial Summ. J. on Self-Reported Income Taxes* (ECF No. 67). Mr. Newman responded on September 19, 2023, *Def. Robert K. Newman's Resp. to United States of America's Mot. for Partial Summ. J. on Self-Reported Income Taxes* (ECF No. 80), and the Government replied on October 2, 2023. *Pl. United States of America's Reply Br. in Support of its Mot. for Partial Summ. J. on Self-Reported Income Taxes* (ECF No. 91). On November 9, 2023, the Court granted in part and dismissed in part the motion for partial summary judgment, holding Mr. Newman liable to the Government for self-reported income tax liabilities for tax years 2011-2017 and 2020 in the amount of $255,319.79 as of July 31, 2023, and further ordering that valid tax liens exist securing those tax liabilities attached to 13 Annies Way and that the Government was entitled to enforce the liens through sale of the Property through receivership. *Order on Pl. United States of America's Mot. for Partial Summ. J. on Self-Reported Income Taxes* at 29-30 (ECF No. 98). The Court also dismissed the Government's request for judgment in excess of $255,319.79. *Id.* at 30.

3

The Government subsequently moved for reconsideration on November 20, 2023, noting an error in its submission and requesting the Court revise its judgment to reflect a self-reported income tax liability amount of $325,132.52 as of July 31, 2023. *Pl. United States of America's Mot. to Reconsider Ruling on Partial Summ J. and Amend J. to Include Post-Return Statutory Penalties and Interest* (ECF No. 103). Determining the correction was warranted due to a typographical error in the Government's initial filing, the Court granted the motion for reconsideration on December 28, 2023. *Order on Mot. for Recons.* (ECF No. 110).

Meanwhile, on August 1, 2023, the Government filed a motion seeking the appointment of a prejudgment receiver to sell 13 Annies Way. *Pl. United States of America's Mot. for Appointment of Pre-J. Receiver to Sell Prop.* (ECF No. 52). On October 23, 2023, the Court granted the Government's motion and appointed a receiver to arrange for the Property's sale, with any proposed sale subject to an opportunity for objection by all Defendants, including Mr. Newman, and a final sale conditioned on approval by the Court. *Order on Mot. for Appointment of Pre-J. Receiver to Sell Prop.* at 19, 24 (ECF No. 95).

On May 30, 2024, in compliance with the Court's October 23, 2023 order appointing receiver, the Government moved for the Court's approval of a sale agreement for 13 Annies Way for a purchase price of $815,000. *Pl. United States' Mot. to Approve Sale of 13 Annies Way and Post-Closing Deposit of Net Proceeds in the Ct. Registry* at 1 (ECF No. 122). Over Mr. Newman's objection, *Def. Robert K. Newman's Resp. and Rejection of Mot. to Approve Sale of 13 Annie[]s Way and Post-*

*Closing Deposit of Net Proceeds in the Ct. Registry* (ECF No. 125), on July 8, 2024 the Court granted the Government's motion and authorized the proposed sale of 13 Annies Way. *Order on Mot. to Approve Sale of 13 Annies Way* (ECF No. 130).

Following the Property's sale, on August 5, 2024, the Government filed a motion to deposit the sale proceeds into the Court registry, *Pl. United States' Mot. to Deposit Funds into Ct. Registry* (ECF No. 131), and, two days later, filed an amended motion "to correct the amount of net proceeds the closing attorney is holding." *Pl. United States' Am. Mot. to Deposit Funds into Ct. Registry* at 1 n.1 (ECF No. 132) (*Am. Mot. to Deposit*). The Maine Revenue Services, appearing as a party-in-interest, opposed the motion on August 28, 2024. *Resp. to Pl. United States' Am. Mot. to Deposit Funds into the Ct. Registry* (ECF No. 133). On December 30, 2024, the Court granted the Government's amended motion to deposit funds and ordered the Clerk of Court and closing attorney to deposit the remaining net proceeds in the amount of $131,157.93 (the Deposited Proceeds) into the Court registry.[2] *Order on Mot. to Deposit Funds* at 17 (ECF No. 149).

Separately, on December 26, 2024, the Government moved for summary judgment on its remaining claims, asking the Court to enter judgment holding Mr. Newman liable for trust fund recovery penalty liabilities in the amount of $403,863.32 as of December 23, 2024, plus statutory additions from before and after that date until fully paid, as well as holding Mr. Newman liable to the United States

---

[2]    Upon information from the Court Registry, the Deposited Proceeds have accrued interest in the amount of $2,600.71 as of July 7, 2025. As such, as of this date, the Deposited Proceeds constitute a total amount of $133,787.63.

for income tax, penalties, and interest assessed against him for tax year 2010. *Pl. United States' Mot. for Summ. J. on Remaining Claims* (ECF No. 147) (*Gov't's Summ. J. Mot.*); *United States' Statement of Undisputed Facts Supporting Summ. J. on Remaining Liabilities* (ECF No. 148) (PSMF). After the parties submitted a joint motion for an extension of the response deadline until March 13, 2025, which the Court granted, Mr. Newman did not file a response. *See United States of America's and Def. Robert K. Newman's Mot. to Extend Summ. J. Mot. Resp. Deadline* (ECF No. 158); *Order* (ECF No. 159).

On January 14, 2025, the Government filed a stipulation of an agreement between it and KSB, informing the Court of their compromise that $8,000 of KSB's legal fees would be given first priority as a lien on 13 Annies Way ahead of the Government's federal tax liens, and thus that KSB shall be paid $8,000 out of the Deposited Proceeds and the rest shall go to federal tax liens or other parties able to establish interests in the Deposited Proceeds that are senior to the federal tax liens. *Stip. Regarding Priority of Bank's Legal Fees as Lien on Prop. and Distribution of Sale Proceeds* at 1-3 (ECF No. 155) (*First Stip.*). The Government and KSB further agreed that "this Stipulation is limited to the priority of the legal fees as a lien on the property and thus does not affect the collectability of the balance of the legal fees incurred by Kennebunk Savings Bank more generally as a debt of Robert K. Newman arising out of the terms of the mortgage notes." *Id.* at 2.

On February 21, 2025, the Government filed another stipulation regarding lien priority, informing the Court that it had agreed with the Woods Association, Inc.,

Maine Revenue Services, Maine Department of Labor, Casco Bay Electric, LLC, and Tax Collector of Kennebunk, Maine (together, the Lienholder Parties) on the status and order of remaining interests with regard to the Deposited Proceeds.[3]  *Stip. Regarding Lien Priority and Distribution of Sale Proceeds Among Lienholders* (ECF No. 160) (*Second Stip.*).

Specifically, the Tax Collector of Kennebunk, Maine agrees that all of its outstanding property taxes and assessments had been satisfied by proceeds disbursed at the time of the sale of 13 Annies Way, such that it has no remaining interests in the Deposited Proceeds.  *Id.* at 2.  The Lienholder Parties agree that the United States's tax liens with regard to Mr. Newman's self-reported income taxes, as well as interest and associated penalties, had previously been reduced to judgment by the Court's order on motion for partial summary judgment and thus will not be satisfied by the Deposited Proceeds.  *Id.* at 3.  The Woods Association and Maine Department of Labor agree that each, respectively, is not entitled to any of the Deposited Proceeds. *Id.*  The Maine Revenue Services agrees that it is not entitled to any of the Deposited Proceeds towards its recorded lien interests but reserves the right to assert a claim to a portion of the Deposited Proceeds for statutory real estate withholding pursuant

---

[3]      In describing the Deposited Proceeds, the Government refers to "$131,186.92 deposited with the Court." *Stip. Regarding Lien Priority and Distribution of Sale Proceeds Among Lienholders* at 2 (ECF No. 160) (*Second Stip.*).  This number is different than the $131,157.93 amount the Court ordered deposited in the Court registry, which had reflected the amount submitted by the Government's filing. *See Additional Attachs. [Updated Proposed] Order Granting Pl. United States' Am. Mot. to Deposit Funds into Ct. Registry* at 2 (ECF No. 138) (proposing Court enter an order authorizing deposit into the Court registry of "the remaining net proceeds, in the amount of $131,157.93"); *Order on Mot. to Deposit Funds* (ECF No. 149) (the Court ordering the closing attorney, Matthew J. Williams, to deposit the remaining net proceeds in the amount of $131,157.93 into the Court registry).  The parties have not explained, nor is the Court otherwise aware of, the basis for the nearly $30 dollar difference between the amount ordered and actually deposited in the Court Registry.

to 36 M.R.S. § 5250-A.  *Id.*  Finally, the Lienholder Parties agree that pursuant to the prior stipulation, KSB will be paid $8,000 for mortgage-related legal fees ahead of the federal tax liens.  *Id.* at 4.

Based on these agreed-upon provisions, the Government and Lienholder Parties agree the Deposited Funds will be distributed as follows: $8,000 to KSB and the remaining amount to the United States, the latter after payment toward Maine Revenue Services for any statutory real estate withholding required by agreement or as determined by the Court.  *Id.* at 4.

On April 9, 2025, the Government filed a motion for disbursement of funds currently deposited in the Court registry, explaining that these funds are the remaining proceeds from the sale of the Property and that the stipulations have resolved the order of distribution with the exception of one outstanding issue concerning the Maine Revenue Services' claim to real estate withholding.  *Pl. United States' Mot. to Distribute Sale Proceeds on Deposit with the Ct.* (ECF No. 162) (*Gov't's Disbursement Mot.*).  On this issue, the Government asks the Court to rule the judicial sale to enforce federal tax liens is exempt from real estate withholding under Maine law, and that the Maine Revenue Services is not entitled to proceeds from the sale of the Property.  *Id.* at 1.  The Maine Revenue Services responded via letter on May 22, 2025, indicating it does not object or otherwise respond to the motion.  *Re:* United States of America v. Newman, *Docket No. 2:22-cv-00373-JAW* (ECF No. 169) (*Me. Disbursement Resp.*).

Finally, on June 16, 2025, KSB moved to voluntarily dismiss its crossclaim against Mr. Newman, informing the Court that the Property's foreclosure and sale as a result of this proceeding have obviated the goals of its crossclaim, and as such its crossclaim is moot and dismissal is in the best interest of all parties and the Court. *Def. / Crosscl. Pl. Kennebunk Savings Bank's Mot. to Dismiss Crosscl.* (ECF No. 172) (*KSB's Mot. to Dismiss Crosscl.*).

The Court issues this order to resolve the Government's motion for summary judgment on its remaining claims and motion for disbursement of court-held funds, as well as KSB's motion for voluntary dismissal of its crossclaim. The Court addresses KSB's motion for voluntary dismissal of its crossclaim first.

## II.    KSB'S MOTION FOR VOLUNTARY DISMISSAL OF CROSSCLAIM

### A.    KSB's Motion

KSB moves to voluntarily dismiss its crossclaim pursuant to Federal Rules of Civil Procedure 41(a)(2) and (c). *KSB's Mot. to Dismiss Crosscl.* at 1. KSB reports it "no longer needs to pursue its Cross[c]laim, which subsequent developments in this matter have obviated," explaining that its crossclaim sought foreclosure and sale of the Property, which the court-appointed receiver accomplished in May 2024, culminating in the Court's approval of the sale in July 2024. *Id.* at 1-2 (citing *Order on Mot. to Approve Sale of 13 Annies Way*). At this time, KSB says, its mortgages on the Property were extinguished and its crossclaim seeking foreclosure and sale of the Property was mooted. *Id.* (citing *First Stip.*). KSB posits that "dismissal is in the best interests of the parties and the Court's docket." *Id.*

9

No party responded to KSB's motion.

## B.   Legal Standard

Under Federal Rule of Civil Procedure 41(a), a plaintiff may dismiss an action without court order by filing "(i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or (ii) a stipulation of dismissal signed by all parties who have appeared." FED. R. CIV. P. 41(a)(1)(A).  Otherwise, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." FED. R. CIV. P. 41(a)(2).

Further, regarding the voluntary dismissal of a crossclaim, "[a] claimant's voluntary dismissal under Rule 41(a)(1)(A)(i) must be made: (1) before a responsive pleading is served; or (2) if there is no responsive pleading, before evidence is introduced at a hearing or trial." FED. R. CIV. P. 41(c).

## C.   Discussion

KSB brought a crossclaim for foreclosure and sale against Mr. Newman on May 25, 2023, naming the Government and the Lienholder Parties as parties-in-interest and seeking numerous forms of relief, many of which appear to have been resolved by the subsequent foreclosure and sale of the Property.  *KSB's Crosscl.* at 4 (requesting the Court "a. Determine the amount due on the First KSB Mortgage, including reasonable attorney['s] fees and court costs; b. Determine the order of priority of such other parties as may appear, together with the amounts due such parties, if any; c. Grant possession to Kennebunk Savings Bank upon expiration of

the redemption period; d. Grant such other and further relief as this Honorable Court may determine just and proper").

On a motion for voluntary dismissal brought pursuant to Rule 41(a)(2), "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." FED. R. CIV. P. 41(a)(2)); however, "dismissal without prejudice is the norm, 'unless the court finds that the defendant will suffer legal prejudice.'" *Colón-Cabrera v. Esso Standard Oil Co. (P.R.)*, 723 F.3d 82, 87 (1st Cir. 2013) (quoting *P.R. Mar. Shipping Auth. v. Leith*, 668 F.2d 46, 50 (1st Cir. 1981)); *accord Tuck v. City of Gardiner Police Dep't,* No. 1:18-cv-00212-JDL, 2020 U.S. Dist. LEXIS 99199, at *4 (D. Me. June 5, 2020) (citing same). The Court "is responsible for ensuring that such prejudice will not occur." *Colón-Cabrera*, 723 F.3d at 87 (citing *Doe v. Urohealth Sys., Inc.*, 216 F.3d 157, 160 (1st Cir. 2000)).

To determine whether the defendant will suffer legal prejudice, courts consider several factors, including the defendant's effort and expense in preparing for trial, the plaintiff's diligence in prosecuting the action, the sufficiency of the plaintiff's explanation of the need for a dismissal, and whether the defendant has filed a motion for summary judgment. *See id.* at 88 (citing *Doe*, 216 F.3d at 160). While these factors are among those considered, "a court is not 'always required to give a lengthy explanation of its reasons,' and it 'need not analyze each factor or limit [its] consideration to [the] factors' listed above." *Tuck*, 2020 U.S. Dist. LEXIS 99199, at *4 (quoting *Doe*, 216 F.3d at 160).

11

Here, over three years have passed between KSB's filing of its crossclaim and its motion to voluntarily dismiss the same. However, KSB explains that the purpose of its crossclaim of foreclosure and sale of the Property has been accomplished by subsequent developments in this case, and is now moot. *KSB's Mot. to Dismiss Crosscl.* at 1-2. It is black letter law that a plaintiff is "the master of the claim" and may make strategic decisions about its framing and purpose. *Cf. Ortiz-Bonilla v. Federacion de Ajedrez de P.R., Inc.*, 734 F.3d 28, 36 (1st Cir. 2013) ("The plaintiff is the "master of the claim . . ..").

KSB further avers that a crossclaim may be voluntarily dismissed under Federal Rule of Evidence 41(c), so long as the voluntary dismissal is made "(1) before a responsive pleading is served; or (2) if there is no responsive pleading, before evidence is introduced at a hearing or trial." *KSB's Mot. to Dismiss Crosscl.* at 1 n.1 (citing FED. R. CIV. P. 41(c)). Here, KSB notes that, while Mr. Newman did not file an answer to the crossclaim, other interested parties did. *Id.*; *see also Answer: State of Me., Me. Revenue Services* (ECF No. 42); *Crosscl. Party-in-Interest Me. Dep't of Labor's Answer to Crosscl.* (ECF No. 43); *Pl. / Crosscl. Party-in-Interest United States of America's Answer to Def. / Crosscl. Pl. Kennebunk Savings Bank's Crosscl.* (ECF No. 44). Evidence on KSB's crossclaim has not been presented at a hearing or trial; thus, without any objection from Mr. Newman or the interested parties, the Court concludes granting the voluntary dismissal of KSB's crossclaim is authorized under the federal rules and, further, that doing so here "is in the best interests of the parties and the Court's docket." *KSB's Mot. to Dismiss Crosscl.* at 2.

## III.   THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

As a threshold matter, Mr. Newman failed or declined to file a response to the Government's motion for summary judgment.  He further has not contested any of the facts included within the Government's accompanying statement of facts.

The First Circuit Court of Appeals has unequivocally stated that "[w]hen a non-moving party fails to file a timely opposition to an adversary's motion for summary judgment, the court may consider the summary judgment motion unopposed, and take as uncontested all evidence presented with that motion." *Perez-Cordero v. Wal-Mart P.R.*, 440 F.3d 531, 533-34 (1st Cir. 2006) (citing *NEPSK, Inc. v. Houlton*, 283 F.3d 1, 7-8 (1st Cir. 2002)); *accord Girard v. Dodd*, No. 2:16-cv-00165-LEW, 2019 U.S. Dist. LEXIS 129294, at *2-3 (D. Me. Aug. 2, 2019) ("If a party opposing a motion for summary judgment fails to file a written objection (along with a memorandum of law) within 21 days from the date the motion was filed, that party will be 'deemed to have waived objection'") (quoting ME. LOC. R. 7(b) and citing FED. R. CIV. P. 56(e)(2), (3) ("If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show  that the movant is entitled to it")).  The First Circuit has held that "[w]hile an unopposed summary judgment motion still must be scrutinized in accordance with Fed. R. Civ. P. 56, a district court's decision to treat a summary judgment motion as unopposed is serious business.  In most cases, a party's failure to oppose summary judgment is

fatal to its case." *Perez-Cordero*, 440 F.3d at 534 (citing *NEPSK, Inc.*, 283 F.3d at 7-8).

Although Mr. Newman is a pro se litigant, "[i]t is well-settled in this Circuit that a pro se litigant is not exempt from compliance with procedural rules." *Demmons v. Tritch*, 484 F. Supp. 2d 177, 182 (D. Me. 2007) (citing *Rivera v. Riley*, 209 F.3d 24, 28 (1st Cir. 2000), *abrogated on other grounds by Casanova v. Dubois*, 289 F.3d 142 (1st Cir. 2002); and *Posadas de P.R., Inc. v. Radin*, 856 F.2d 399, 401 (1st Cir. 1988)). Nonetheless, mindful of Mr. Newman's pro se status, the Court reviews the Government's motion and each of its proffered facts to determine whether each fact is adequately buttressed by record support and whether the proffered facts, taken together, establish the Government's entitlement to judgment as a matter of law on its remaining claims pursuant to Rule 56. *See Gakuba v. Frey*, Nos. 23-1084, 23-1095, 2024 U.S. App. LEXIS 18703, at *1 (1st Cir. Apr. 10, 2024) (construing pro se filings liberally) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

## A.   The United States' Position

### 1.   The United States' Statement of Material Facts

As noted, the failure of a party to respond to a statement of material facts does not bind the Court to accept each proffered fact. Instead, the moving party must itself comply with Local Rule 56 and supply record support for each of its proposed facts. *See* D. ME. LOC. R. 56(f) ("The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment"). To assure that the Government's proposed facts are properly before the Court, the

Court reviewed each of the proffered facts to determine whether each is adequately buttressed by the record support indicated by the Government. Having done so, the Court concludes that each of the Government's proposed facts was properly supported by a record citation and thus admits all material facts proffered by the Government.

### a.   Trust Fund Recovery Penalties

#### i.   Robert Newman's Financial Control over Newman Communications

In August 1993, Mr. Newman incorporated Newman Communications, Inc. (Newman Communications or the Company), the business of which was to generate publicity for book authors. PSMF ¶¶ 1, 2. Mr. Newman served as president and sole shareholder of Newman Communications from at least 1997 through 2013. *Id.* ¶ 3. As president, Mr. Newman was responsible for the hiring of personnel. *Id.* ¶ 4.

He hired David Ratner as an account executive in 1997; Mr. Ratner became co-president by 2001 but left the Company in 2013. *Id.* ¶ 5. While at Newman Communications, Mr. Ratner's primary role as co-president was to generate new business for the Company and he had little to no involvement in the management and operation of the Company's finances. *Id.* ¶¶ 6-7. However, Mr. Ratner did have check-writing authority and would sign checks on behalf of the Company, including Form 941 Employer's Quarterly Federal Tax Returns when Mr. Newman was not in the office, which would occur when Mr. Newman spent significant amounts of time away from the office visiting Maine and Maryland. *Id.* ¶¶ 8. However, no checks were ever written without Mr. Newman's approval and direction. *Id.* ¶ 9.

15

Around the end of 2009, Mr. Newman also hired Carl Attardo as a bookkeeper to maintain the Company's books and records; Mr. Attardo provided these services through 2013. *Id.* ¶ 10. Mr. Attardo would sometimes be charged with paying the payroll taxes on behalf of the Company. *Id.* ¶ 11. However, every payroll tax payment made by Mr. Attardo had to receive prior authorization from Mr. Newman. *Id.* Newman Communications also employed Edward J. Stafford as an information technology (IT) administrator from 2000 to 2013. *Id.* ¶ 12. In this role, Mr. Stafford maintained backup copies of business records, including QuickBooks accounting records and Outlook emails. *Id.* ¶ 13. Mr. Stafford produced backup copies and records of Newman Communications, such as emails, to the United States pursuant to a subpoena. *Id.* ¶ 14.

Mr. Newman managed the financial operations of, and was the sole financial decisionmaker over, Newman Communications from at least 2009 through 2013. *Id.* ¶ 15. He had sole responsibility and decision-making authority for who, what, and when, payments on behalf of the Company were made. *Id.* ¶ 16. In 2012, when the Company spent approximately $1,045,000 on payroll, including Mr. Newman's wages of $216,488.84, Mr. Newman had sole discretion over the allocation of approximately $1.8 million in company gross receipts for that year. *Id.* ¶¶ 17, 18. Newman Communications also spent approximately $346,803.84 on other company-related expenses such as health and life insurance, office and computer supplies, professional fees, rent, bank and credit fees, dues and subscriptions, meals and travel, internet and telephone, utilities, interest, and web page services in 2012. *Id.* ¶ 19.

From at least 1997 through 2013, Mr. Newman always had check-writing authority for the Company. *Id.* ¶ 20. While others had check writing authority as well at certain points during this period, the others' authority could only be exercised with Mr. Newman's consent. *Id.* ¶ 21. At all times, Mr. Newman was aware of all checks and payments drawn on the business's accounts and was aware of all Company income, debts, and liabilities. *Id.* ¶ 22.

By December 31, 2012, Newman had borrowed at least $153,306.50 from the Company. *Id.* ¶ 23. He used his financial control over Newman Communications to pay for personal expenses, including payments relating to his alimony and child support obligations, his houses, and his cars. *Id.* ¶ 24.

### ii. Newman Communications' Financial Challenges

Following the financial crisis of 2008, Newman Communications experienced financial difficulties, which continued all the way through the Company's closure in 2013. *Id.* ¶ 25. During this time, the Company began to fall behind on some of its debts, and these debts only grew as time went by; Newman was aware of the Company's unpaid bills. *Id.* By December of 2012, the Company had liabilities totaling $1,044,370.45, and had negative equity in the amount of $884,867.39. *Id.* ¶ 26. Mr. Newman would occasionally request employees hold off on cashing checks from the Company due to the its financial struggles. *Id.* ¶ 27. Despite the Company's hardship, Newman took a distribution of at least $382,289.43 in 2012, in addition to his $216,488 salary. *Id.* ¶ 28. In 2013, he took flow-through income from the Company in the amount of $126,110. *Id.* ¶ 29.

### iii. Newman Communications' Unpaid Federal Tax Liabilities

Newman Communication's liabilities included unpaid debts for federal payroll taxes that by June of 2010 amounted to $192,387.30. *Id.* ¶ 30. Around 2010, Internal Revenue Service (IRS) Agent Rocco Derose corresponded with Mr. Newman and the Company regarding its payroll tax debt, informing Mr. Newman in a letter dated February 1, 2010 of the IRS's intent to levy his personal assets for the unpaid payroll taxes for the second and third quarters of 2009. *Id.* ¶¶ 31, 32. Despite substantial payments being made towards the Company's payroll tax debt, there was never a time, from at least 2009 through 2013, where the Company was current on its federal payroll tax obligations. *Id.* ¶ 33. Payroll taxes would only be paid under Mr. Newman's approval and only when funds were available. *Id.* ¶ 34. Mr. Newman sometimes directed that the taxes be paid with a credit card. *Id.* ¶ 35.

At all times, Mr. Newman was aware of the Company's unpaid federal payroll taxes. *Id.* ¶ 36. In internal emails to Mr. Ratner, Mr. Newman expressed his concerns and frustrations over payments required to be made toward the Company's federal payroll tax debt. *Id.* ¶ 37. At one point, Newman Communications utilized ADP for all its payroll processing needs, which included a service where ADP would automatically pay for the Company's payroll taxes using Company funds. *Id.* ¶ 38. With respect to the fourth quarter of tax year 2011, the first, second, and fourth quarters of tax year 2012, and the first quarter of 2013, Newman chose not to use this additional service by ADP. *Id.* ¶ 39.

18

iv.    IRS Assessments of Trust Fund Recovery Penalties

A delegate of the United States Secretary of the Treasury made assessments against Mr. Newman for trust fund recovery penalties (TFRPs) pursuant to 26 U.S.C. § 6672 with regard to the periods, on the dates, and in the amounts set forth in the next several paragraphs below, based on his willful failure to collect, truthfully account for, and pay over income federal employment and unemployment taxes that were withheld from the wages of employees of Newman Communications, and the assessments have balances due, including accruals, as of December 23, 2024, for each period as follows, as also indicated in the following subparagraphs:

1) For tax period ending December 31, 2011 (or fourth quarter of 2011), the IRS assessed Mr. Newman $82,127.99 on March 18, 2013; this assessment has a balance due of $74,849.05 through December 23, 2024.  *Id.* ¶ 40(a). For this period, Mr. Ratner signed the Form 941 Quarterly Federal Tax Return.  *Id.*

2) For tax period ending March 31, 2012 (or first quarter of 2012), the IRS assessed Mr. Newman $28,971.90 on March 18, 2013; this assessment has a balance due of $49,194.43 through December 23, 2024.  *Id.* ¶ 40(b).  For this period, Mr. Ratner signed the Form 941 Quarterly Federal Tax Return. *Id.*

3) For tax period ending June 30, 2012 (or second quarter of 2012), the IRS assessed Mr. Newman $50,574.82 on March 18, 2013; this assessment has a balance due of $85,876.28 through December 23, 2024.  *Id.* ¶ 40(c).  For

this period, Mr. Ratner signed the Form 941 Quarterly Federal Tax Return. *Id.*

4) For tax period ending December 31, 2012 (or fourth quarter of 2012), the IRS assessed Mr. Newman $100,900.43 on September 9, 2013; this assessment has a balance due of $175,843.98 through December 23, 2024. *Id.* ¶ 40(d).  For this period, Mr. Newman signed the Form 941 Quarterly Federal Tax Return. *Id.*

5) For tax period ending March 31, 2013 (or first quarter of 2013), the IRS assessed Mr. Newman $10,813.72 on September 9, 2013; this assessment has a balance due of $18,099.58 through December 23, 2024. *Id.* ¶ 40(e). For this period, Mr. Newman signed the Form 941 Quarterly Federal Tax Return. *Id.*

After the application of all abatements, payments, and credits, Mr. Newman remains indebted to the United States of America for the assessed TFRP liabilities described above, in the total amount of $403,863.32 through December 23, 2024, plus such additional amounts as may accrue from and after that date as provided by law. *Id.* ¶ 41.

### b.    Income Tax for 2010 Based on Unreported Income

On February 3, 2012, Mr. Newman reported to the IRS that the tax on his income for tax year 2010 was $493,382. *Id.* ¶ 42.  For 2010, Mr. Newman reported $4 in earned interest income and no income from taxable retirement distributions. *Id.* ¶ 43.  However, in or around November 2013, the IRS received a form 1099-INT from Simsbury Bank showing that Mr. Newman earned $83 in interest instead and

a form 1099-R from the Hartford Retirement Services, LLC, showing that it made a $35,000 retirement distribution to Mr. Newman for the 2010 year, identified as taxable. *Id.* ¶¶ 44, 45.

On November 18, 2013, a delegate of the Secretary of the Treasury made an additional income tax assessment in the amount of $13,322 against Mr. Newman for tax year 2010 based on the $35,079 in additional income that Mr. Newman failed to disclose to the IRS. *Id.* ¶ 46. This liability has a balance due of $29,669.16 after taking into account the assessment of taxes, penalties, interest, and other statutory additions, and all payments, credits, abatements, and accruals as of December 31, 2024. *Id.* ¶ 47.

### 2. The United States' Motion

The Government moves for summary judgment on its remaining claims, which it characterizes as:

> (A) Defendant Robert K. Newman is liable for the trust fund recovery penalty liabilities assessed against him under 26 U.S.C. § 6672 with regard to Newman Communications, Inc., for the fourth quarter of tax year 2011, the first, second, and fourth quarters of tax year 2012, and the first quarter of 2013, inclusive, in the amount of $403,863.32 as of December 23, 2024, plus statutory additions from and after that date until fully paid; and

> (B) Defendant Robert K. Newman is liable to the United States for income tax, penalties, and interest assessed against him by a delegate of the Secretary of the Treasury for tax year 2010, as the result of an examination of his Form 1040 for the 2010 tax year and third-party information received by the IRS.

*Gov't's Summ. J. Mot.* at 1-2. Noting that the Court has previously granted partial summary judgment in its favor with regards to "(1) Robert K. Newman's liabilities for self-reported income taxes for tax years 2011 to 2017 and 2020, (2) that the tax

liens securing these liabilities attached to real property located at 13 Annies Way, Kennebunk, Maine, and (3) that the United States was entitled to enforce these liens under 26 U.S.C. § 7403 through a sale of that property which has since occurred," the Government avers that "[t]his motion, if granted, will result in a final judgment" of its case. *Id.* at 2.

The Government elaborates that the IRS's examination-based additional assessments of income tax for tax years 2010 and 2011 represent part of Count One of its complaint, which seeks to reduce Mr. Newman's income tax liabilities to judgment, whereas the assessments of TFRPs under 26 U.S.C. § 6672 for unpaid employment taxes of Newman Communications, Inc represent Count Two of its complaint. *Id.* at 3-4.[4]  The Government adds that it is "abandoning its claim for the 2011 tax year, which was based on an exam-based assessment regarding a disallowance of a mortgage interest deduction," explaining that it has reviewed the evidence and concluded "[t]he net additional tax when errors are all corrected is small" and not worth pursuing in light of Mr. Newman's total liability for all taxes and period. *Id.* at 4.

Turning to the income tax liability for 2010, the Government argues its assessment is entitled to a presumption of correctness pursuant to *Shafmaster v.*

_____

[4]    The Government includes, within its motion for a summary judgment on its remaining claims, a separate section titled "Plaintiff United States' Memorandum of Law in Support of its Motion for Summary Judgment on Remaining Claims." *Gov't's Summ. J. Mot.* at 3.  This memorandum of law is not attached as a separate document, but rather as a section of its motion; however, the filing's pagination restarts at page 1 for the memorandum of law. *Id.*  As the motion thus has multiple pages one and two, the Court therefore adopts the pagination of the PDF on the ECF filing software in its citations for clarity, rather than using the page numbers provided in the document itself.

*United States*, 707 F.3d 130 (1st Cir. 2013), in which the First Circuit confirmed IRS determinations should be afforded a "presumption of correctness, so the taxpayer bears the burden of proving that an assessment was erroneous." *Id.* (quoting *Shafmaster*, 707 F.3d at 135). Here, the Government says, Mr. Newman did not rebut its assessment with any evidence. *Id.* Based on the IRS's examination, the Government seeks to hold Mr. Newman liable for an additional income tax assessment for income he failed to report on his 2010 tax return in the amount of $13,222 plus interest and penalties, which total $29,669.16 as of December 31, 2024. *Id.* at 4-5. The Government calculates its assessment based on income of $83 in interest and a $35,000 taxable retirement distribution for the 2010 tax year, which Mr. Newman failed to report on his 2010 tax return. *Id.* at 5.

Turning to the TFRPs, the Government submits the undisputed evidence establishes Mr. Newman had complete financial oversight and control over his wholly owned business, and thus may be held liable for the Company's unpaid payroll taxes under 26 U.S.C. § 6672(a). *Id.* The Government avers that "[f]or five quarterly periods between 2011 and 2013," the Company "failed to remit the withheld portions of certain payroll taxes." *Id.* As a result, the IRS assessed TFRPs against Mr. Newman for these periods, "which have a balance due of $403,863.[3]2 as of December 23, 2024." *Id.* Pursuant to 26 U.S.C. § 6672(a), an individual may be held liable for a TRFP if a responsible "person required to collect, truthfully account for, and pay over" trust fund taxes "willfully fails" to do so. *Id.* (quoting 26 U.S.C. § 6672(a)). Mr. Newman has previously admitted that he is such a responsible person, *id.* (citing *The*

23

*Def.'s Answer to the Compl.* at 4, ¶ 14 (ECF No. 29), and the Government contends it has proven Mr. Newman's non-payment was done willfully.  *Id.*

After reciting the relevant material facts, *id.* at 5-11, the Government avers 26 U.S.C. §§ 3101(a) and 3402(a) require an employer to deduct and withhold income and social security taxes from the wages paid to its employees.  *Id.* at 11 (citing *Slodov v. United States*, 436 U.S. 238, 242–43 (1978)).  An employer must also pay their own contributions to the social security system pursuant to 26 U.S.C. § 3111.  *Id.* at 12. The amount of withheld taxes must be reported on an employer's payroll tax return, Form 941, which the employer must file for every calendar quarter and is generally due on the last day of the first month following the quarter.  26 C.F.R. §§ 31.6071(a)-1(a), 31.6011(a)-4(a)(1).

The Internal Revenue Code provides that taxes withheld by an employer from their employees' wages "shall be held to be a special fund in trust for the United States[.]"  *Id.* (citing 26 U.S.C.§ 7501(a)).  These so-called "trust fund taxes" may not be used as working capital for the business or to pay the employer's business expenses, including payroll, *id.* (citing *Slodov*, 436 U.S. at 243), because doing so would cause a revenue loss to the United States, which credits the amount withheld against the employees' individual income tax liabilities once the trust fund taxes are withheld from wages.  *Id.* (citing 26 U.S.C. § 31(a)(1); 26 C.F.R. § 1.31-1(a)).

The Government submits that 26 U.S.C. § 6672(a) provides "[a]ny person required to collect, truthfully account for and pay over such tax, . . . shall . . . be liable for a penalty equal to the total amount of the tax evaded, or not collected, or not

accounted for and paid over," a liability often referred to as a TFRP. *Id.* at 13. To attach to an individual, the person must be "(1) a 'responsible person' under the statute, and he must (2) 'willfully' fail to pay over to the Government the amount due." *Id.* (citing *Thomsen v. United States*, 887 F.2d 12, 14 (1st Cir. 1989); *Caterino v. United States*, 794 F.2d 1, 3 (1st Cir. 1986); *Harrington v. United States*, 504 F.2d 1306, 1311 (1st Cir. 1974)). The IRS's assessment of a TFRP is presumed correct; the person assessed bears the "burden of proving by a preponderance of the evidence that he or she is not a 'responsible person' or did not act 'willfully.'" *Id.* (quoting *Keohan v. United States*, 138 F. Supp. 2d 62, 73 (D. Mass. 2001)).

Here, the Government says, Mr. Newman has already admitted he is a responsible person, *id.* at 14 (citing *Def.'s Answer to the Compl.* at 4, ¶ 14), and it has offered presumptive proof of a valid assessment through the declaration of IRS Revenue Officer Wendy Belair, which Mr. Newman has not contested. *Id.*

Turning to the element of willfulness, the First Circuit defines "willfulness" in the context of § 6672 as "a voluntary, conscious and intentional decision to prefer other creditors to the United States[.]" *Id.* (quoting *Harrington*, 504 F.2d at 1311). "Any responsible person who knows the taxes are not paid and allows the business to pay other creditors acts willfully." *Id.* (quoting *Caterino*, 794 F.2d at 6). A particular showing of malicious intent or knowledge of the law is not required, rather, "it is enough if a defendant knows that the taxes are due from the company and yet disburses funds for other purposes or knowingly fails to pay the required sum to the government." *Id.* (quoting *Lubetzky v. United States*, 393 F.3d 76, 80 (1st Cir. 2004)).

The Government contends Mr. Newman acted willfully because he "was aware that taxes for the quarters at issue here were due at the time the taxes arose based on the Form 941s that were either signed by [Mr.] Ratner or by [Mr.] Newman himself." *Id.* at 14-15 (citing PSMF ¶ 36). This includes Form 941s for the first quarter of 2011 and the first and second quarters of 2012 signed by Mr. Ratner, which showed payroll taxes due in the amount of $127,614.59, $47,971.90, and $68,270.09, respectively, and extends to the Form 941s for the fourth quarter of 2012 and first quarter of 2013, signed by Mr. Newman himself, which showed payroll tax balances of $120,832.67 and $6,468.44, respectively. *Id.* at 15.

However, instead of using the $1.8 million in gross receipts earned by the Company by the end of 2012, the Company, under Mr. Newman's direction, used those funds to "pay for more employee wages in the amount of $1,045,000 (including his own wages of $216,488.84) and for company expenses like health and life insurance, rent, office supplies, professional fees, bank and credit card fees and internet and telephone charges." *Id.* (citing PSMF ¶¶ 18-19). In addition to salary, Mr. Newman "took distributions totaling $382,289.43—money that could have been used to pay *all* taxes owed for these periods at the time that such liabilities arose." *Id.* at 16 (citing PSMF ¶¶ 28, 40(a)-(d) (Government's emphasis)). The Government adds that, between January 1, 2013 and March 31, 2013, the Company paid nine employees a total of $101,209.04, and that, for tax year 2013, Mr. Newman "reported flow-through income from Newman Communications on his 2013 Form 1040 in the amount of $126,110." *Id.* (citing PSMF ¶ 29). Thus, the Government contends Mr.

Newman willfully failed to pay the Company's payroll tax liabilities for the first quarter of 2013, as well as prior quarters, and instead chose to pay himself and his employees. *Id.*

Focusing specifically on the 2010 tax year, the Government submits the undisputed facts unequivocally establish its entitlement to a money judgment against Mr. Newman. According to the Declaration of IRS Agent Belair, "the IRS received third-party information from Simsbury Bank and from Hartford Retirement Services, LLC, showing that Newman received a total amount of $35,079 in additional income that he never reported to the IRS for the 2010 tax year." *Id.* (citing PSMF ¶ 45). As a result, the IRS assessed Mr. Newman for this amount, "which currently has a balance due of $29,669.16 as of December 31, 2024." *Id.* at 17 (citing PSMF ¶ 46). The Government reiterates that this assessment has a legal presumption of correctness and that Mr. Newman has not presented any contradictory evidence to overcome this presumption. *Id.*

The Government concludes by urging the Court to grant its motion for summary judgment on its remaining claims. *Id.*

## B.    Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain*

*Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

On a motion for summary judgment, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), disregarding "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## C.    Discussion

### 1.    Trust Fund Recovery Penalty Liability

26 U.S.C. §§ 3102(a) and 3402(a) "respectively require deduction from wages paid to employees of the employees' share of [Federal Insurance Contribution Act (FICA)] taxes, and the withholding tax on wages applicable to individual income taxes." *Slodov*, 436 U.S. at 343-43 (citing 26 U.S.C. §§ 3102(a) and 3402(a)). The amount of withheld taxes must also be reported on the employer's payroll tax return (Form 941), which must be filed quarterly with the federal government. 26 C.F.R. § 31.6011(a)-4(a)(1). For employers who fail to do so, 26 U.S.C. § 6672 requires "[a]ny person required to collect, truthfully account for and pay over such tax, . . . shall . . .

be liable for a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over." 26 U.S.C. § 6672(a). As previously explained, a TFRP attaches to an individual if he is, first, a "responsible person" under 26 U.S.C. § 6672 and, second, if he "willfully" fails to pay the Government the amount due. *See, e.g.*, *Thomsen*, 887 F.2d at 14; *Caterino*, 794 F.2d at 3; *Harrington*, 504 F.2d at 1311.

The Court first considers whether the Government has demonstrated that Mr. Newman failed to "collect, truthfully account for, and pay over" the income federal employment and unemployment taxes withheld from the wages of Newman Communications employees. In its statement of material facts, the Government submits that the IRS made at least five separate assessments against Mr. Newman:

1) For tax period ending December 31, 2011 (or fourth quarter of 2011), the IRS assessed Mr. Newman $82,127.99 on March 18, 2013; this assessment has a balance due of $74,849.05 through December 23, 2024. PSMF ¶ 40(a).

2) For tax period ending March 31, 2012 (or first quarter of 2012), the IRS assessed Mr. Newman $28,971.90 on March 18, 2013; this assessment has a balance due of $49,194.43 through December 23, 2024. *Id.* ¶ 40(b).

3) For tax period ending June 30, 2012 (or second quarter of 2012), the IRS assessed Mr. Newman $50,574.82 on March 18, 2013; this assessment has a balance due of $85,876.28 through December 23, 2024. *Id.* ¶ 40(c).

29

4) For tax period ending December 31, 2012 (or fourth quarter of 2012), the IRS assessed Mr. Newman $100,900.43 on September 9, 2013; this assessment has a balance due of $175,843.98 through December 23, 2024. *Id.* ¶ 40(d).

5) For tax period ending March 31, 2013 (or first quarter of 2013), the IRS assessed Mr. Newman $10,813.72 on September 9, 2013; this assessment has a balance due of $18,099.58 through December 23, 2024. *Id.* ¶ 40(e).

The Government explains that "[a]fter the application of all abatements, payments, and credits," the assessed TFRP liabilities described above total an "amount of $403,863.32 through December 23, 2024, plus such additional amounts as may accrue from and after that date as provided by law." *Id.* ¶ 41.

First Circuit caselaw is clear that IRS assessments constitute presumptive proof of a valid assessment, *Stuart*, 337 F.3d at 35 (citing *Geiselman v. United States*, 961 F.2d 1, 6 (1st Cir. 1992)), a presumption that "places the burden of proof on [the defendant] to show that the IRS's determination is invalid. *Id.* (quoting *Helvering v. Taylor*, 293 U.S. 507, 515 (1935)). Here, Mr. Newman has not filed any response contesting the veracity of the IRS's assessments; thus, the Court concludes the Government has proven the validity and accuracy of the assessments in their stated amounts through their submission of the IRS assessments.

The Court turns to whether the Government has established that the alleged TRFP liability attaches to Mr. Newman individually by proving he is a "responsible person" who acted "willfully."

Addressing first the "responsible person" element, the First Circuit has explained:

> The controlling inquiry in determining whether the taxpayer should be held "responsible" is whether the person possessed sufficient control over corporate affairs to avoid the default. *Vinick v. Comm'r*, 110 F.3d 168, 172 (1st Cir. 1997). "In deciding whether an assessed individual is a 'responsible person' under 26 U.S.C. § 6672(a)[], federal courts typically consider various indicia of responsibility, such as the holding of corporate office, the authority to disburse corporate funds, stock ownership, and the ability to hire and fire employees." *Adams v. Coveney*, 162 F.3d 23, 26 n.1 (1st Cir. 1998).

*Stuart*, 337 F.3d at 36.

Here, the Government first points out that Mr. Newman admitted in April 2023 that he "was a person required to collect, truthfully account for, or pay over the employment taxes of Newman Communications, Inc." *Def.'s Answer to the Compl.* at 4, ¶ 14. Mr. Newman has not contested this point, either directly in response to the Government's motion to dismiss or at any other point in this proceeding.

The Court also reviewed the Government's statements of fact for indicia of Mr. Newman's responsibility. Company employees averred that Mr. Newman "served as president and sole shareholder of Newman Communications from at least 1997 through 2013" and, in his role as president, "was responsible for the hiring of personnel." PSMF ¶¶ 3, 4. Further, the Government submitted robust testimonial evidence from Company employees indicating that Mr. Newman "managed the financial operations of, and was the sole financial decisionmaker over, Newman

31

Communications from at least 2009 through 2013," *id.* ¶ 15; that he "had sole responsibility and decision-making authority for who, what, and for when, payments on behalf of the company were made," *id.* ¶ 16, and that, in 2012, he "had sole discretion over the allocation of approximately $1.8 million in company gross receipts for that year." *Id.* ¶ 17. On this record and without any basis to conclude otherwise, the Court deems Mr. Newman a "responsible person" for Newman Communication's TRFP liability.

Next, the Court reviews the record for evidence that Mr. Newman acted "willfully" in his failure to "collect, truthfully account for and pay over such tax." 26 U.S.C. § 6672(a). *See, e.g., Caterino*, 794 F.2d at 6 ("Willfulness for purpose of section 6672 means no more than knowledge that taxes are due and withheld and conscious disregard of the obligation to remit them)." On this point, the Government submits ample evidence that Mr. Newman was aware of the TRFPs owed for the fourth quarter of 2012 and the first quarter of 2013 based on his own signature on the Form 941s for those quarters. PSMF ¶ 40(d-e). The Government contends he was further aware of the TRFPs owed for the fourth quarter of 2011 and the first and second quarters of 2012 despite the Form 941s for these quarters being signed by Mr. Ratner, *id.* ¶ 40(a-c), because no Company-related documents could be signed without Mr. Newman's approval, *id.* ¶ 9, and because he was at all times aware of all Company debts and liabilities. *Id.* ¶¶ 22, 35.

The Government further points out that, when Mr. Newman had the opportunity to pay the TRFPs owed, he chose not to do so. The Government posits

Newman Communications had gross receipts of approximately $1.8 million by the end of 2012, *id.* ¶ 17, and yet Mr. Newman, instead of using these funds to pay the payroll taxes for the fourth quarter of 2011 and the first, second, and third quarters of 2012, directed the Company to use those funds to pay $1,045,000 in employee wages, including $216,488.84 in salary to himself, as well as later taking distributions totaling $382,289.43. *Id.* at ¶¶ 18-19, 28. Continuing this trend, rather than pay the TRFPs for the first quarter of 2013 or the amounts owed for prior quarters, the Company paid nine employees a total of $101,209.04 during the first quarter of 2013, *Gov't's Summ. J. Mot.*, Attach. 19, *Ex. 15: 941 For 2013: Employer's QUARTERLY Federal Tax Return*, and for the 2013 tax year, Mr. Newman himself reported flow-through income from the Company of $126,110. *Id.* ¶ 29.

The First Circuit has plainly held that "willful" action in the context of 26 U.S.C. § 6672(a) does not require "[e]vil motive" or "specific intent." *Caterino*, 794 F.2d at 6. Rather, all that is required is "knowledge that taxes are due and withheld and conscious disregard of the obligation to remit them." *Id.* Based on the record, Mr. Newman undeniably was aware that the Company had failed to pay the TRFPs owed for the relevant quarters, and yet nonetheless he directed the Company to continue paying employees, including himself, in 2012 and 2013 and, as such, acted "willfully." PSMF ¶¶ 18-19, 28-29. Perhaps most egregiously, despite four quarters of non-payment, Mr. Newman in 2012 personally took distributions totaling $382,289.43. *Id.* ¶ 28. As the Government points out, this amount "could have been used to pay *all* taxes owed for these periods at the time that such liabilities arose.

*Gov't's Summ. J. Mot.* at 16 (citing PSMF ¶¶ 28, 40(a)-(d) (Government's emphasis). Mr. Newman presents neither evidence nor argument contradicting the Government's proffered facts.  The Court thus concludes that Mr. Newman, with full knowledge of the taxes owed, consciously disregarded his obligation to remit them, and as such, acted willfully in his failure to "collect, truthfully account for and pay over such tax."  26 U.S.C. § 6672(a).

At bottom, the Court determines that Mr. Newman is liable under 26 U.S.C. § 6672(a) to the United States for the TFRP liabilities of Newman Communications for the fourth quarter of tax year 2011, the first, second, and fourth quarters of tax year 2012, and the first quarter of tax year 2013, in the amount of $403,863.32 as of December 23, 2024, plus statutory additions from and after that date until fully paid.

### 2.    Liability for 2010 Tax Year Assessment

The Court next addresses the Government's final remaining claim to an additional examination-based assessment against Mr. Newman for the 2010 tax year.

The record indicates that, for tax year 2010, Mr. Newman "reported $4 in earned interest income and no income from taxable retirement distributions."  PSMF ¶ 43.  However, in November 2013, "the IRS received a form 1099-INT from Simsbury Bank showing that Newman earned $83 in interest instead," and also "received a form 1099-R from the Hartford Retirement Services, LLC, showing that it made a $35,000 retirement distribution to Newman for the 2010 year, identified as taxable." *Id.* ¶¶ 44-45.  As a result, the IRS "made an additional income tax assessment in the amount of $13,322 against [Mr.] Newman for tax year 2010 based on the $35,079 in

additional income that [Mr.] Newman failed to disclose to the IRS." *Id.* ¶ 46. This liability currently has a balance of $29,669.16, "taking into account the assessment of taxes, penalties, interest, and other statutory additions, and all payments, credits, abatements, and accruals as of December 31, 2024." *Id.* ¶ 47. The Government submits courts afford IRS assessments a presumption of correctness that the taxpayer bears the burden of overcoming. *Gov't's Summ. J. Mot.* at 15 (citing *Shafmaster*, 707 F.3d at 135). In the absence of any evidence to the contrary, the Government submits the Court should grant its requested relief of a money judgment for this assessment. *Id.* at 14-15.

As relevant here, "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. § 6321. Upon a taxpayer's failure "to pay federal taxes despite a demand for payment, tax liens 'in favor of the United States' automatically attach to all of that person's 'property and rights to property, whether real or personal.'" *Hannon v. City of Newton*, 744 F.3d 759, 765 (1st Cir. 2014) (quoting 26 U.S.C. § 6321).

Here, the IRS provided Mr. Newman with notice and demand of his 2010 assessment of $13,322, plus interest, via a letter dated February 11, 2013. *See Gov't's Summ. J. Mot.*, Attach. 21, *Ex. 17: IRS Correspondence* at 1-16. The Government avers "the IRS properly made an assessment against [Mr.] Newman for this amount,

which currently has a balance due of $29,669.16 as of December 31, 2024." *Gov't's Summ. J. Mot.* at 16-17 (citing PSMF ¶ 47). Mr. Newman presents neither evidence nor argument that he did not receive such notice or that the assessment against him is erroneous. Based on the IRS's assessment of Mr. Newman's 2010 unpaid tax liability, the Court concludes the 2010 additional assessment has become "a lien in favor of the United States" against Mr. Newman, *see* 26 U.S.C. § 6321, and thus orders Mr. Newman liable to the United States for income tax, penalties, and interest assessed against him by the IRS for tax year 2010.

## IV.   THE UNITED STATES' MOTION FOR DISBURSEMENT OF FUNDS

### A.   The Parties' Positions

#### 1.   The United States' Motion

The Government moves the Court to disburse the funds presently deposited in the Court Registry in the amount of $8,000 to KSB and all remaining amounts to the United States. *Gov't's Disbursement Mot.* at 1. The Government avers "[t]he funds are remaining proceeds from a sale of the real property at 13 Annies Way, Kennebunk, in the principal amount of $131,157.93," and submits the lienholders have stipulated to this distribution with the exception of "one unresolved issue concerning Maine Revenue Service[s'] claim to real estate withholding." *Id.* (citing *Second Stip.*). With regards to that issue, the Government requests the Court "rule that the judicial sale to enforce federal tax liens is exempt from real estate withholding under 36 Maine Rev. Stat. § 5250-A and that, as a result, Maine Revenue Services is entitled to none of the proceeds of the sale." *Id.*

36

The Government notes that it sought the consent of all non-defaulted parties via email, and that the following parties do not object to the requested disbursement: KSB, the Woods Association, and the Town of Kennebunk. *Id.* at 1-2. "Robert Newman objects, though he did not state a reason." *Id.* at 2. The Maine Revenue Services, Maine Department of Labor, and Casco Bay Electric LLC did not respond with their respective positions on the motion. *Id.* The Government submits the payees, U.S. Department of Justice and Kennebunk Savings Bank, will submit completed Internal Revenue Service W-9 forms prior to distribution, and concludes that, should the Court grant its pending motion for summary judgment, then the Government "will have received all the relief it requested and represents that, following distribution, this case may be closed." *Id.*

Attached to its motion, the Government files a supporting memorandum of law, first elaborating on its assertion that "[b]y stipulation of the lienholder parties, certain federal tax liens have the most senior priority after the [KSB's] now-satisfied mortgages, and those senior tax liens will not be satisfied by the remaining proceeds". *Id.*, Attach. 1, *Mem. of Law in Support of Pl. United States' Mot. to Distribute Remaining Sale Proceeds on Deposit with the Ct.* at 1 (*Gov't's Disbursement Mem.*). The only remaining issue, the Government says, is "Maine Revenue Service[s'] putative claim to state-law real estate withholding pursuant to 36 M.R.S. § 5250-A (the 'Maine Withholding Statute')." *Id.*

Turning to this unresolved issue, the Government explains the Maine Withholding Statute "requires buyers of certain real estate in Maine to withhold and

pay over to the State Tax Assessor 2.5% of the sale consideration," an amount which is then "credited as a payment toward the owner-seller's Maine income tax." *Id.* at 4 (citing 36 M.R.S. §§ 5250-A(2), (10); 5252). This withholding generally applies only if the owner-seller is not a resident of Maine, *id.* (citing 36 M.R.S. §§ 5250-A(3)(A)), and, if not met, the buyer or person responsible for real estate escrow may be held personally liable for the non-resident seller's tax. *Id.* (citing 36 M.R.S. § 5250-A(2), (9)).

The Government submits two reasons why the Maine Withholding Statute does not apply to the judicial tax-lien-enforcement sale in this case. First, the Government contends 36 M.R.S. § 5250-A(3-A) expressly exempts the state real estate withholding tax for a "foreclosure sale when the consideration paid does not exceed the debt secured by the property held by a mortgagee or lienholder," *id.* at 2 (quoting 36 M.R.S. § 5250-A(3-A)), and argues the purpose of this provision is to protect mortgagees and lienholders with pre-existing secured interests. *Id.* Second, the Government argues that, if the Maine Withholding Statute is interpreted to apply to the sale of the Property, "it would then be preempted by federal statutory law that gives priority to federal tax liens above inchoate and unrecorded state income taxes." *Id.*

Elaborating on its first point, the Government explains that the Property "sold for $815,000 when encumbered by two mortgages over $600,000, federal tax liens over $700,000, local property taxes over $30,000, and various other liens held by other creditors." *Id.* at 4. The statute states "[n]o tax is required to be withheld pursuant

38

to this section by a buyer at a ***foreclosure sale when the consideration paid does not exceed the debt secured by the property held by a mortgagee or lienholder***." *Id.* at 5 (quoting 36 M.R.S. § 5250-A(3-A)) (Government's emphasis). Thus, the Government submits the tax sale overseen by this Court "falls squarely within the text and purposes of this exemption." *Id.*

The Government states it is a lienholder for "federal taxes [] secured by statutory liens," and its "secured federal tax debts will not be satisfied by the sale." *Id.* Conceding the term "foreclosure sale" is not defined by the relevant statute, the Government argues "[i]n Maine the term 'foreclosure' is used generally for many different forced sales to recover debts or other interests that are secured by mortgages or liens encumbering real estate." *Id.* at 6 (citing 36 M.R.S. § 943 (providing foreclosure for real estate tax liens); 14 M.R.S. § 6203-F (foreclosure remedy available for real estate seller when purchaser defaults); 14 M.R.S. § 6321 (provision for foreclosure by civil action of any "mortgage")). The Government submits this action, though pursuant to 26 U.S.C. § 7403, serves the same purpose as Maine's state-law foreclosure proceedings of "a public sale of the premises, with any net proceeds of the sale going to the defaulting purchaser after payment of the outstanding loan balance and costs of the foreclosure proceeding." *Id.* (quoting *Thurston v. Galvin*, 94 A.3d 16, 22 (Me. 2014) (internal citations omitted)).

The Government next explains how the debt secured on the Property, including mortgages worth over $600,000 and federal tax liens of nearly $300,000 already reduced to judgment by this Court, exceeds the $815,000 purchase consideration. *Id.*

39

at 6-7.  The Government avers the exception to the Maine Withholding Statute applies unless there is a surplus over the secured debt, which has not occurred here. *Id.* at 7.  Permitting the extraction of real estate withholding form this judicial sale, the Government insists, "would unfairly and illogically result in the delinquent taxpayer Robert Newman getting a credit toward his 2024 state income taxes at the U.S. Government's expense." *Id.*

In the alternative, the Government argues the federal lien statutes, 26 U.S.C. §§ 6321 and 6323, preempt the Maine Revenue Services' claim to a real estate withholding toward Mr. Newman's 2024 state income tax.  The Government avers "[a] federal tax lien arises at the time of the tax's assessment," *id.* (citing 26 U.S.C. § 6321), and "[i]ts priority vis-à-vis other liens or interests is governed by federal law." *Id.* at 7-8 (citing *Aquilino v. United States*, 363 U.S. 509, 513-14 (1960)).

Under federal law, the Government says, its federal tax liens have priority over the Maine Revenue Services' real estate withholding because it was "first in time." *Id.* at 8 (citing *United States v. McDermott*, 507 U.S. 447, 449 (1993); *United States v. City of New Britain, Conn.*, 347 U.S. 81, 84 (1954)).  The Government argues the Maine Revenue Services could not "jump ahead of the federal tax liens" by assessing "an inchoate lien to attach at some arbitrary time before the amount of the tax, assessment, etc., is determined" for Mr. Newman's 2024 Maine income tax.  *Id.* (quoting *New Britain*, 374 U.S. at 86; *United States v. Pioneer Am. Ins. Co.*, 374 U.S. 84, 88–89 (1963)).  The Government adds that the Maine Withholding Statute does

not create a lien, but rather is a liability enforced against the buyer or person responsible for the real estate escrow.

The Government focuses next on the federal tax lien priority exception most analogous to the Maine Revenue Services' claimed withholding, 26 U.S.C. § 6323(b)(6), which applies to liens securing payment of "a tax of general application levied by any taxing authority based upon the value of such property." *Id.* at 9 (quoting 26 U.S.C. § 6323(b)(6)(A)). In this case, the Government submits, "there is no lien, let alone a perfected lien," the "Maine real estate withholding is not even a tax, but a means of collection," and "Maine's withholding obligation does not involve the kind of tax covered by (b)(6), which are *ad valorem* property taxes." *Id.* Here, the amount of the withholding tax "is based upon the sale price and numerous other non–ad valorem factors including basis, deductions, credits, and overall income." *Id.*

The Government thus concludes that Court should rule the receivership sale of 13 Annies Way was exempt from the state of Maine real estate withholding under 36 M.R.S. § 5250-A and that Maine Revenue Services is not entitled to any withholding out of the sale, and should grant its motion for disbursement of court-held proceeds in the amount of $8,000 to Kennebunk Savings Bank and the rest to the United States. *Id.* at 10.

### 2.    The Maine Revenue Services' Response

The Maine Revenue Services' response to the Government's motion merely states that it "will not be objecting to that motion or otherwise filing a response to the motion." *Me. Disbursement Resp.* at 1.

###    B.    Discussion

The parties have filed two stipulations in this case resolving the order of priority to their respective claims to the sale proceeds of the Property, currently deposited in the Court Registry.

In the First Stipulation, the Government and KSB informed the Court that $8,000 of KSB's legal fees would be given first priority as a lien on 13 Annies Way ahead of the Government's federal tax liens, and thus that KSB shall be paid $8,000 out of the Deposited Proceeds and the rest shall go to federal tax liens or other parties able to establish interests in the Deposited Proceeds that are senior to the federal tax liens. *First Stip.* at 1-3.

In the Second Stipulation, the Lienholder Parties and the Government informed the Court that they had resolved the priority of sale proceeds distribution amongst themselves. *Second Stip.* The Tax Collector of Kennebunk, Maine agrees that it has no remaining interests in the Deposited Proceeds, *id.* at 2, and the Woods Association and Maine Department of Labor each respectively agree that it is not entitled to any of the Deposited Proceeds. *Id.* at 3. The Maine Revenue Services agrees that it is not entitled to any of the Deposited Proceeds towards its recorded lien interests, but reserves the right to assert a claim to a portion of the Deposited Proceeds for statutory real estate withholding pursuant to 36 M.R.S. § 5250-A. *Id.* However, as explained, the Maine Revenue Services has subsequently declined to object to the Government's requested disbursement, including the federal Government's position that the Maine Revenue Services is not entitled to a real estate

withholding in the present case. *Me. Disbursement Resp.* Finally, the Lienholder Parties agree that pursuant to the prior stipulation, KSB will be paid $8,000 for mortgage-related legal fees ahead of the federal tax liens. *Second Stip.* at 4.

The Court concludes that granting the Government's requested disbursement of funds is appropriate. In light of the Court's adjudication granting the Government's motion for summary judgment on its remaining claims and KSB's motion for voluntary dismissal of its crossclaim, the Court determines the only unresolved matter to be the question of disbursement of the remaining sale proceeds currently held by the Court Registry. The parties have stipulated as to the priority of disbursement, which the Court understands to be, first, $8,000 to be distributed to Kennebunk Savings Bank for the purpose of legal fees and, second, the remaining sale proceeds to be distributed to the Government. *First Stip.*; *Second Stip.* The Maine Revenue Services has expressly declined to press its potential claim to Maine real estate withholding pursuant to 36 M.R.S. § 5250-A, *Me. Disbursement Resp.*, and, further, the Government has presented compelling arguments that this case falls within the exception provided in 36 M.R.S. § 5250-A(3-A) as "a foreclosure sale when the consideration paid does not exceed the debt secured by the property held by a mortgagee or lienholder." 36 M.R.S. § 5250-A(3-A). In the absence of any objection to the Government's motion for disbursement, the Court deems any argument that the Maine Revenue Services is entitled to real estate withholding under the Maine Withholding Statute to have been waived. *See, e.g.*, *United States v. Zannino*, 895

F.2d 1, 17 (1st Cir. 1990) (holding "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

For these reasons, the Court grants the United States' motion for disbursement of funds in accordance with the order of priority stipulated to by the parties.

## V.    SUMMARY

First, the Court grants KSB's motion to voluntarily dismiss its crossclaim pursuant to Federal Rule of Civil Procedure 41 based upon its determination that its claim has been mooted by the developments of this case.

Second, the Court grants the Government's motion for summary judgment on its remaining claims, concluding that Mr. Newman failed or declined to respond to the Government's motion and statement of material facts and that the facts presented, supported by evidence, establish the Government's entitlement to judgment as a matter of law on its remaining claims.

Third, the Court grants the Government's motion for disbursement of funds, which reflects the order of priority of distribution agreed to by all parties via stipulation.

## VI.    CONCLUSION

In light of the foregoing, the Court GRANTS Defendant / Crossclaim Plaintiff Kennebunk Savings Bank's Motion to Dismiss Crossclaim (ECF No. 172).

The Court further GRANTS the United States' Motion for Summary Judgment on Remaining Claims (ECF No. 147) and orders JUDGMENT be entered in favor of the United States.  It is hereby ORDERED, ADJUDGED, and DECREED that:

1. Defendant Robert K. Newman is liable for the trust fund recovery penalty liabilities assessed against him under 26 U.S.C. § 6672 with regard to Newman Communications, Inc., for the fourth quarter of tax year 2011, the first, second, and fourth quarters of tax year 2012, and the first quarter of 2013, inclusive, in the amount of $403,863.32 as of December 23, 2024, plus statutory additions from and after that date until fully paid; and

2. That Defendant Robert K. Newman is liable to the United States for income tax, penalties, and interest assessed against him by a delegate of the Secretary of the Treasury for tax year 2010, as the result of an examination of his Form 1040 for the 2010 tax year and third-party information received by the IRS. This includes additional tax of $13,222 plus penalties and interest that total $29,669.16 as of December 31, 2024.

The Court further GRANTS the United States' Motion to Distribute Remaining Sale Proceeds on Deposit with the Court (ECF No. 162), and ORDERS that the Clerk of Court disburse the funds on deposit in the Registry of the Court in the principal amount of $131,157.93, plus any interest accrued to date of disbursement, with no administrative fee charged as the proceeds are primarily payable to the United States Government, as follows:

1. Eight thousand dollars ($8,000) to Defendant Kennebunk Savings Bank, and counsel for Kennebunk Savings Bank is ORDERED to provide the Clerk's Office with instructions on remitting payment within seven days of the issuance of this order; and

2.  All remaining amounts to Plaintiff United States of America (payable to

"U.S. Department of Justice", ATTN: TAXFLU, P.O. Box 310, Washington,

D.C. 20044; with reference to CMN 2023100033).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 11th day of July, 2025